NEW ENGLAND HEALTH CARE,
EMPLOYEES UNION, DISTRICT
1199, SEIU/AFL–CIO, Plaintiff

v.

Honorable John G. ROWLAND, Governor of State of Connecticut, individually and in his official capacity and Patricia Wilson–Coker, Commissioner of the Department of Social Services, individually and in her official capacity, Defendants.

Civil Action No. 301CV464JCH.

United States District Court,
D. Connecticut.

April 17, 2001.

John M. Creane, Michael E. Passero, Law Offices of John M. Creane, Milford, CT, for plaintiff.

Gary S. Starr, Sheila Huddleston, Brian Clemow, Shipman & Goodwin, Hartford, CT, James K. Robertson, Jr., Carmody & Torrance, Waterbury, CT, for defendants.

**RULING ON PLAINTIFF S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION [DKT. NO. 1]**

HALL, District Judge.

This is an action for injunctive relief and declaratory judgment arising from the conduct of the defendants, the Honorable John G. Rowland, Governor of the State of Connecticut, and Patricia Wilson–Coker, Commissioner of the Department of Social Services ("defendants"), in connection with a one-day strike by members of the plaintiff Union, New England Health Care Employees Union, District 1199, SEIU/AFL–CIO ("District 1199"). District 1199 alleges that the defendants' use of State power in connection with an ongoing labor dispute and strike between District 1199 and

forty Connecticut nursing homes violated its members' First Amendment rights and interfered with its members' rights protected by the National Labor Relations Act ("NLRA"). This action is brought pursuant to 42 U.S.C. § 1983.[1]

Pending before the court is District 1199's motion for a Temporary Restraining Order and Preliminary Injunction [Dkt. No. 1].[2] District 1199 asks the court to enjoin the defendants from:

1. [a]pplying Conn. Gen.Stat. § 17b–340 in a manner that permits the [Department of Social Services ("DSS") ] to make direct and/or expedited reimbursement to licensed nursing homes for strike preparations or strike-related costs, as described in Deputy Commissioner Michael Starkowski's February 7, 2001 letter to providers .... [and] 2.[d]eploying National Guard/State Militia personnel, during any nursing home strike conducted by Plaintiff union, to perform routine tasks on behalf of nursing home owners that are normal strike operation responsibilities of nursing home owners, absent emergency conditions affecting the health or safety of residents in any affected nursing home.

Plaintiff's Proposed Order of Relief [Dkt. No. 27].

The issue presented by District 1199's motion is whether federal labor policy preempts the authority of the State to reimburse immediately the Medicaid portion of the costs of replacement workers for struck private sector nursing homes, to provide other state services to support the employers' ability to withstand a strike, and to use the National Guard to provide transportation for replacement workers.[3] Because the court concludes that, on the record before it, District 1199 has not established a likelihood of success on the merits, the motion for preliminary injunction is denied.

## I. FINDINGS OF FACT [4]

### A. District 1199 and Connecticut Nursing Homes

District 1199 is a labor organization within the meaning of Section 2(a) of the

1. The court notes that District 1199 has organizational standing to bring this action because: (1) it has numerous members that have standing in their own right to present the claims asserted herein; (2) the interests sought to be protected are germane to the District 1199's purpose; and (3) neither the claim asserted nor the relief requested requires that the District 1199 members participate individually in the suit. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

2. The court denies the Motion for Temporary Restraining Order as moot, in light of the hearing on the preliminary injunction.
   During the hearing on the motion for a preliminary injunction, in response to the court's inquiry, District 1199 requested that the court order the trial of the action on the merits to be advanced and consolidated with the hearing on the preliminary injunction pursuant to Federal Rule of Civil Procedure

65(a)(2). The defendants objected on the basis that issues raised during the preliminary injunction hearing required further discovery. The court has determined not to proceed to the merits and will therefore rule only on District 1199's motion for a preliminary injunction.

3. In its complaint, District 1199 also alleges that the defendants' actions interfered with the employees' exercise of their constitutional rights of free speech, assembly and petition guaranteed under the First Amendment of the United States Constitution. At oral argument on April 11, 2001, District 1199 waived this claim as a basis for preliminary injunction.

4. The Findings of Fact are based upon the parties Stipulation [Dkt. No. 15] and the limited testimony and exhibits offered at the hearing on the preliminary injunction motion on April 9 and 10, 2001. Two witnesses testified on direct through affidavits, which were

National Labor Relations Act ("NLRA"), 29 U.S.C. § 152(5). District 1199 represents approximately 7,000 union members who are employed at seventy-one nursing homes in Connecticut. These members are employed as registered nurses, licensed practical nurses, nurses' aides, housekeepers, and in maintenance, laundry, clerical, and other positions.

The State of Connecticut currently has approximately 250 licensed nursing homes, with 30,000 licensed nursing home beds. Connecticut nursing homes are regulated by the State of Connecticut under the auspices of the Department of Public Health ("DPH"). DPH establishes and monitors the level of care and staffing required to maintain the safety, health, and welfare of the nursing home residents. Conn. Gen. Stat. §§ 19a–493, 19a–496. DPH is responsible by state statute for assessing the care and services provided to these nursing home residents in order to determine that the residents' health, safety, and welfare are being properly cared for. *Id.*

In order to ensure the safety of nursing home residents during any strike, DPH requires nursing homes to submit strike contingency plans. *Id.* § 19a–497. In the past, nursing homes have prepared for strikes or other job actions by making alternative preparations for the care of residents– obtaining volunteers, hiring temporary replacement workers, or requiring supervisors to provide resident care. In some instances, nursing homes have moved residents, stopped admitting new residents, or otherwise curtailed operations. During previous nursing home strikes, the State has sent inspectors or monitors to the nursing homes to ensure that residents were continuing to receive care during the strike. In addition, should the health and safety of nursing home residents be jeopardized by a strike, the State, through the Commissioner of the Department of Public Health, can seek the appointment of a receiver, stop admissions, move nursing home residents, or limit the license of a nursing home. *See id.* §§ 19a–485 through 19a–560.

Approximately 76% of the residents in the nursing homes affected by the strike at issue in this case are covered by the federal Medicaid program. *See* 42 U.S.C. §§ 1396–1396v. Under that program, the State, through its Department of Social Services ("DSS"), reimburses nursing homes for the cost of the food, shelter, and medical care of those residents covered by the Medicaid Program.[5] The federal government reimburses the State for 50% of its allowable Medicaid costs. Approximately 10% of the State's budget is spent on Medicaid for nursing homes.

DSS reimburses each Connecticut nursing home the facility's "base rate" for care provided to Medicaid-eligible residents. Conn. Gen.Stat. § 17b–340. Each facility's "base rate" is determined by DSS periodically under a methodology that utilizes the historical costs of providing care at a particular nursing home. A facility's historical costs of providing care are determined from a report that the facility is required to provide annually to DSS itemizing all expenditures for the fiscal year ending on September 30. *Id.* § 17b–340(a). State law puts caps on spending in many different areas, which caps affect the provision in the law that allows reimbursement for reasonable costs mandated by collective

---

marked as exhibits. Exs. 57, 58. One of these witnesses was subject to cross-examination (Michael P. Starkowski), *see* Ex. 57, and the other, by agreement, was not (Peter Elleff), *see* Ex. 58.

**5.** The percentage of residents receiving Medicaid at these forty nursing homes ranges from 56% to 94%.

bargaining agreements. *Id.* State law provides for calculation of each facility's base reimbursement rate once every two to four years. *Id.* § 17b–340(f)(8). DSS has concluded that the cap does not apply to "extraordinary" costs as allowed under Connecticut General Statute § 17b–340(a).

### B. 1999 Strike-related Reimbursements

In February of 1999, during the last significant round of negotiations between the nursing homes and District 1199, District 1199 sent out ten-day strike notices to forty-seven nursing homes with whom its contracts had expired. Although District 1199 did not announce its intention to withdraw these notices until forty-eight hours prior to the strike date, the State had not determined that immediate reimbursement of strike-related expenses, including pre-strike payment of any deposit required to contract for replacement workers, was necessary to assure the health and safety of nursing home residents of the targeted homes. District 1199 entered into new contracts, without striking, with most of the nursing homes after the State announced an additional $75 million would be made available for nursing home labor costs.

Subsequently, however, when no contracts were reached with some nursing homes, District 1199 struck them. In connection with these strikes later in 1999 and 2000, DSS received and processed, on an *ad hoc* basis, requests for special Medicaid reimbursement for strike preparations and strike-related costs, attributable to the Medicaid portion of their population, which it determined were necessary to avoid a negative impact on the health and safety of nursing home residents. Such payments

totaled $723,254 in calendar years 1999 and 2000 and were made to sixteen nursing homes. A significant portion of the strike-related reimbursement related to strike preparation included non-refundable deposits for replacement workers and security. Although engaged in strike action against these sixteen nursing homes in 1999, District 1199 never learned of the State's reimbursement of strike-related expenses in excess of the capped rate previously determined by the State as the reimbursable rate.

### C. 2001 State Contingency Plan

Apparently aware that a number of contracts between District 1199 and fifty-one nursing homes were to expire in March 2001, state officials held meetings within state agencies beginning as early as September 2000 to discuss concerns about contingency planning to protect the health and safety of residents of the nursing homes involved. State officials also met with some nursing home owners and with representatives of the nursing home owners association. They also met once with union representatives.

Long before strike notices were issued, state officials determined that state contingency plans were necessary because the individual nursing homes ability to serve their residents was subject to disruption by a number of factors beyond the control of the homes owners. Factors considered by the defendants,[6] which could prevent the nursing home owners from providing adequate care, included the availability, reliability, and appropriate licensure of replacement workers; the availability of adequate transportation to get the replacement workers to sites where they were needed; the vagaries of weather or other

---

**6.** In referring to the "defendants," the court includes their agents, such as responsible state agency officials.

problems that could delay replacement workers traveling to Connecticut from distant locales; the financial plight of many of the nursing homes with expiring labor contracts; the lack of census in many of the nursing homes; and the need to coordinate among the nursing homes struck given the large number of workers and residents involved.

As Deputy Commissioner of Administration at DSS, Michael P. Starkowski ("Starkowski") is responsible for the public administration and management of the agency's medical care programs, including Medicaid. His responsibilities include rate setting and certificate of need functions, as well as the Medicaid provider financial claims processing and applicable federal reimbursement functions. Starkowski testified that in February of 2001 DSS was concerned that the affected nursing homes would not be financially capable of paying strike-related costs if they were not reimbursed until some later date. Starkowski testified that he understood that eleven of the nursing homes involved were in Chapter 11 bankruptcy proceedings [7] and eight had interim relief requests pending. The interim relief requests had been pending before DSS for six to eight months without action. In addition, due to the health care worker shortage and the large number of replacement workers needed in 2001, DSS concluded, along with many of the owners of the affected facilities, that the only viable option for obtaining replacement workers was through an out-of-state contractor. Although the State gave "cursory" consideration to some other options, such as placing some of the struck nursing homes in receivership, moving some residents out of struck homes to other facilities, and

ceasing new admissions, it determined that reimbursing nursing homes for "extraordinary costs," including reimbursement of contracted-for replacement workers, was the most viable option to serve the State's articulated purpose of assuring the health and safety of residents of nursing homes with expiring District 1199 labor contracts.

Fearing that the nursing homes would not be able to meet the advance payment requirements of the contractor used for replacement workers in 2001, DSS determined that expedited reimbursement was necessary in order to protect the health and safety of the residents and ensure that the level and quality of care and services for the nursing home residents were in compliance with the DPH requirements. DSS made this determination, however, without regard to consideration of which individual nursing homes needed "extraordinary" advances in order to provide adequate care during a strike. Starkowski cited time pressures and limited staff as reasons why each nursing home that might be struck was not individually analyzed to determine if state assistance, in the form of immediate reimbursement of "extraordinary" costs above the rate cap, was necessary for the State to assure the health and safety of the residents at these nursing homes.[8]

When asked why DSS found such measures necessary in March of 2001 but not in 1999, Starkowski testified that, the "climate" was different in February of 1999: it was then expected that the State was going to authorize a large infusion of money to the nursing home program, which the Governor announced before the 1999

---

7. The court finds that only four nursing homes involved were in bankruptcy at the time of the strike.

8. Strike-related expenses are the only "extraordinary costs" ever allowed by the Commissioner under the statute.

strike date. He also testified that he did not recall that there were forty-seven strike notices sent in 1999. Starkowski viewed the March 2001 situation as unprecedented.[9]

To the best of Starkowski's knowledge, the federal government has never disallowed reimbursement for any strike-related costs or costs which have been reimbursed to nursing homes on an expedited basis. He based this upon the fact that the federal government reimbursed the State for the 1999/2000 strike-related costs. However, those strike-related reimbursement costs were not broken out or identified as such in the request for payment to the federal government. Starkowski also testified that, in authorizing payments in 2001, he relied on a telephone conversation with a federal employee who saw no reason why strike-related expenses would not be reimbursed as part of Medicaid.

On February 7, 2001, Governor Rowland submitted a supplemental state budget to the legislature that included a $5,000,000 line item to cover contingency planning costs of state agencies and nursing homes. These contingency planning costs, which included the worker replacement expenses, were in anticipation of possible nursing home strikes by District 1199 following expiration of its contracts.

On the same day the supplemental budget was submitted, DSS sent a memo to nursing homes with expiring union contracts notifying them of DSS's intention to immediately reimburse the Medicaid portion of any strike-related costs, including worker replacement costs, as "extraordinary and unanticipated costs." Ex. 51. In the view of DSS, strike-related costs are allowable costs under Connecticut General Statute § 17b–340. To that end, the February 7, 2001 memo advised nursing home owners what extraordinary expenses would be considered to be immediately reimbursable expenses in the event of a potential strike or job action. DSS did not promise to reimburse all strike-related costs, but only those costs that were "extraordinary and necessary for the health and safety of residents." Id. at 1. The memo advised the nursing homes how DSS would reimburse extraordinary or unanticipated costs to avoid an immediate negative impact on the welfare, health, and safety of the nursing home residents. The memo further notified the nursing homes that they had to comply with the obligations of the NLRA. It also stated that DSS reserved the right to recover all or, if appropriate, a portion of the expedited reimbursement should the National Labor Relations Board ("NLRB") determine that a nursing home engaged in unfair labor practices.

In addition to DSS's assessment and plan, the Office of Emergency Management ("OEM"), the state agency responsible for planning, implementation, and management of the State's response to actual or potential natural disasters, public emergencies, or threats to the health, safety, and welfare of the citizens of Connecticut or to their property, facilitated meetings among affected state agencies and developed a comprehensive plan for responding to the potential strikes at the affected nursing homes, as well as at group homes run by other state agencies. The Comprehensive Health Care Support Plan was designed to be implemented in the event that the nursing homes and/or group homes proved unable to provide for the

---

**9.** Given the 1999 situation, the court does not find that notice of strikes at forty nursing homes in 2001 was "unprecedented."

continuous, uninterrupted level and quality of care and services required by the nursing or group home residents.

### D. March 20, 2001 Strike

From January through March 20, 2001, District 1199 met with nineteen nursing home owners operating fifty-one nursing homes in an effort to negotiate successor contracts to agreements that expired on March 15, 2001. Those negotiations failed to result in any successor contracts by March 20, 2001.

On or about March 6, 2001, District 1199 gave written notification to forty-one of the fifty-one Connecticut nursing homes where its members were employed of District 1199's intention to strike on March 20, 2001, beginning at 6:00 a.m., in protest of the lack of progress in negotiating new contracts and the owners' unwillingness to increase staffing in their nursing homes. (Under the NLRA, as amended, District 1199 is required to give a ten-day notice to nursing home owners of its intention to engage in a strike. *See* 29 U.S.C. § 158(g).) Shortly thereafter, District 1199 advised its members that the homes were to be struck for one day until 7:00 a.m. on March 21, 2001. On or about March 15, 2001, District 1199 withdrew its strike notice from one of the nursing homes. On or about March 16, 2001, District 1199 advised the nursing home owners in writing that it intended its strike to last only twenty-four hours. For some time prior to that date, it was well-known to the homes' owners that District 1199 intended only a one-day strike.

Approximately 4,000 employees would be engaged in the work stoppage at the forty nursing homes receiving strike no-

tices. Those forty nursing homes house approximately 5,200 residents who receive care twenty-four hours a day, seven days a week. Most of these nursing home residents require constant supervision, assistance with personal care, multiple medications at varying times, and special diets; many are immobile or require assistance with mobility; many are mentally incompetent; and many require special medical equipment.

District 1199 communicated to local police officials that they intended to obey the lawful orders of the police. On or about March 7, 2001, Jerome P. Brown ("Brown"), President of District 1199, met with Lieutenant Colonel Timothy Barry ("Barry") of the Connecticut State Police to discuss District 1199's strike plans. At that time, Brown expressed District 1199's intention to conduct peaceful, orderly picket lines.

After being notified of the strike, various nursing home owners, through the Connecticut Association of Health Care Facilities ("CAHCF"), entered into contracts for replacement workers with U.S. Nursing Corporation, a company located in Colorado. The nursing homes notified District 1199 that they intended to continue to provide services to nursing home residents and that they would bring in replacement workers.

On March 20, 2001, at 6:00 a.m., the District 1199 and its members engaged in a strike at forty nursing homes. No violence occurred during the strike. At the end of the one-day strike, on March 21, 2001, sixteen of the struck nursing homes refused to permit their striking employees to return to work.[10] On March 22, 2001, fifteen nursing homes refused to permit

---

**10.** Starkowski testified that he was not aware of any nursing home's intention to lock workers out after the one day strike. Although he was aware that the contract with U.S. Nurs-

ing required payment of sixty hours minimum at a rate of twelve hours per day for five days, he never inquired about possible lock-outs.

their striking employees to return to work. On March 23, 2001, thirteen nursing homes refused to permit striking employees to return to work and continued such refusal until Sunday, March 25, 2001, at 6:00 a.m. Approximately 1,844 patients resided in the thirteen nursing homes that refused to permit their employees to return to work. On March 20, 2001, and on the succeeding days when some District 1199 members were not permitted to return to work, members of District 1199 and their supporters peacefully picketed the locked-out nursing homes.

Starting on March 14, 2001, six days before the announced strike date, DSS made expedited payments to nursing homes to enable them to meet their estimated extraordinary expenses. On March 14, 2001, DSS made payments totaling $2 million to cover any pre-strike-related costs. In the end, the expedited payments totaled $4,561,000.

Because Medicaid utilization at the forty affected facilities ranged from 56% to 94%, these expedited Medicaid payments represented from 56% to 94% of the estimated strike-related costs. The cost of securing replacement workers to fill direct-care positions was used as the basis for estimating each nursing home's strike-related costs because DSS believed it was likely to be the largest expense. The estimate calculation began with the projected cost of contracting with U.S. Nursing, then added 30% as an estimated factor for the additional cost of personnel in other positions and added 15% as an estimated factor for other costs. The subtotal was then reduced by the estimated payroll savings

associated with not paying the striking workers on March 20, 2001.[11]

As part of the comprehensive plan developed by the State, and on the order of the Governor, three National Guard units were mobilized on stand-by. Starkowski was unable to recall prior use of Connecticut's National Guard in connection with a labor dispute. During the course of the March 20, 2001 strike and the succeeding days when some members of District 1199 were not permitted to return to work by the nursing home owners, non-uniformed members of one of the units of the National Guard drove vans to transport non-striking nursing home employees and replacement workers to and from struck nursing homes. Two other National Guard units, comprised primarily of medical personnel, were on stand-by to provide direct care on an emergency basis in the event the nursing homes were unable to maintain the required levels of care for their residents. The members of this medical team remained stationed at National Guard facilities and were not sent to any nursing homes during the strike. The National Guard was not otherwise present in any capacity during picketing by District 1199 members and supporters.

During the course of the March 20, 2001 strike and the succeeding days when members of District 1199 were not permitted to return to work by some nursing home owners, and pursuant to the comprehensive plan, Connecticut State Police troopers were assigned to perform traffic, crowd control, and related security functions at the four nursing homes located in communities without local police departments. In Connecticut, the State Police

---

11. Some of the affected nursing homes were owned by large chains with significant resources, and some nursing homes were in stronger financial condition than others; these homes may well have been able to provide for the health and safety of their residents without state assistance. In fact, some of the chains did not use the worker-replacement service referred to in Starkowski's February 7, 2001 memo, Ex. 51 at 1–2, but made their own arrangements without state involvement.

routinely provides law enforcement in those communities that do not have their own police force. *See* Conn. Gen.Stat. § 29–5.

Prior to the March 20, 2001 strike, the Connecticut Department of Transportation ("DOT"), pursuant to the comprehensive plan, identified parking facilities on State-owned property where non-striking nursing home employees and replacement workers could park, and from which they could be transported to and from nursing homes affected by the strike. Although the nursing homes are responsible for transporting people who elect to use the common sites to and from the nursing homes, DOT leased fifty commuter vans at a cost of approximately $200,000 to be available for such transportation in the event the nursing homes or their contractors were unable to do so. During the course of the March 20, 2001 strike, and the succeeding days when some members of District 1199 were not permitted to return to work by the nursing home owners, at least some of those vans were used for that purpose.

The parties anticipate that, unless District 1199 reaches contract settlements with the fifty-one nursing homes whose contracts expired on March 15, 2001, District 1199 will send out additional written ten-day strike notices during April 2001 that could result in additional work stoppages. The defendants have indicated that plans similar to those initiated in March 2001 are in place should further strike notices be sent.

## II. DISCUSSION

### A. Standard

■ A preliminary injunction is an extraordinary remedy that is not to be granted as a routine matter. *JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 80 (2d Cir.1990). Typically, "a party seeking to obtain a preliminary injunction must establish that it will suffer irreparable harm in the absence of an injunction and demonstrate either (1) 'a likelihood of success on the merits' or (2) 'sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly' in the movant's favor." *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir.1996) (citing *Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 779–80 (2d Cir.1994); *Coca–Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 314–15 (2d Cir.1982)).

■ The second "serious questions" standard is also sometimes termed the "fair ground for litigation" standard. *Able v. United States*, 44 F.3d 128, 131 (2d Cir.1995) (per curiam). Where a moving party challenges government action taken in the public interest pursuant to a statutory or regulatory scheme, however, the moving party cannot resort to the alternative or "fair ground for litigation" standard, but is required to demonstrate irreparable harm and a likelihood of success on the merits. *N.Y. City Envtl. Justice Alliance v. Giuliani*, 214 F.3d 65, 68 (2d Cir. 2000); *see also Jolly*, 76 F.3d at 473; *Able*, 44 F.3d at 131 (2d Cir.1995); *Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir.1989).

■ The court finds that the challenge to governmental action exception applies in this case. In *New York City Environmental Justice Alliance*, the Second Circuit held that the plaintiffs could not rely on the "fair ground for litigation" standard in seeking an injunction that would enjoin the City from selling or destroying City-owned parcels comprising community gardens. 214 F.3d at 68. The City had expressed an intention to sell or destroy the parcels in order to construct affordable housing, medical facilities, and retail stores. *Id.* at

67. The court did not consider whether the City's decision was a part of a specific statutory or regulatory scheme but focused on whether the governmental action was taken in the public interest. *Id.* at 68. In this case, the State claims that it acted in the public interest of protecting the health and safety of elderly residents in nursing home facilities. According to the defendants, they acted pursuant to state statute authorizing State payment for nursing home expense and pursuant to its police power. The court thus finds that, for the purpose of determining the appropriate preliminary injunction standard, the State has justified its action as in the public interest pursuant to a statutory or regulatory scheme. Therefore, District 1199 must establish a likelihood of success on the merits and may not rely on the "fair ground for litigation" standard.

In some circumstances, an even higher preliminary injunction standard applies. *Jolly,* 76 F.3d at 473. "The moving party must make a 'clear' or 'substantial' showing of a likelihood of success where (1) the injunction sought 'will alter, rather than maintain, the status quo' – *i.e.,* is properly characterized as a 'mandatory' rather than 'prohibitory' injunction; or (2) the injunction sought 'will provide the movant with substantially all the relief sought, and that relief cannot be undone even if the defendant prevails at a trial on the merits.'" *Id.* (quoting *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,* 60 F.3d 27, 33–34 (2d Cir.1995)).

"The distinction between mandatory and prohibitory injunctions is not without ambiguities...." *Tom Doherty,* 60 F.3d at 34. In a close case, an injunction can often be framed in either mandatory or prohibitory terms. *Jolly,* 76 F.3d at 474; *Tom*

*Doherty,* 60 F.3d at 34. In *Jolly,* the Second Circuit found that the injunction sought was mandatory because it was a challenge to a prison policy that had been in effect for four years and had been applied to the plaintiff for more than three-and-a-half years. 76 F.3d at 474. Under the policy, the plaintiff had been placed in medical keeplock indefinitely. *Id.* Therefore, mandating his release would require a "dramatic shift in established ... policy." *Id.*

The court concludes that the injunction sought in this case is prohibitory in nature. District 1199 is not requesting a "dramatic" shift. Instead, it is seeking an injunction that would temporarily prohibit the State from becoming involved in nursing home strikes in the manner in which it was involved in the March 20, 2001 strike. Neither the duration nor the consistency of such government involvement is sufficient to constitute the status quo. The status quo has not been the immediate reimbursement of extraordinary costs in excess of a capped rate and the mobilizing of the national guard.[12] Therefore, should the injunction be granted, it would not alter the status quo, but would maintain the relationship between employers and employees and prohibit certain State action for a temporary period of time. *See Phillip v. Fairfield Univ.,* 118 F.3d 131, 134 (2d Cir.1997). Such an injunction is prohibitory, not mandatory.

■ The stricter preliminary injunction standard could still apply in this case if the injunction sought would "provide the movant with 'substantially all the relief sought.'" *Tom Doherty,* 60 F.3d at 34 (quoting *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1026 (2d Cir.1985), *abrogated on oth-*

---

12. While the State became involved in funding expenses during previous nursing home strikes in 1999, that occurrence, which was not a matter of public knowledge, is insufficient to constitute the status quo.

*er grounds, Fromer v. Scully,* 874 F.2d 69, 74 (2nd Cir.1989)). The defendants urge that such a basis is present in this case. "If the use of a heightened standard is to be justified, the term 'all the relief to which a plaintiff may be entitled' must be supplemented by a further requirement that the effect of the order, once complied with, cannot be undone." *Id.* at 35. The heightened standard is thus justified when the issuance of an injunction "will render a trial on the merits largely or partly meaningless, either because of temporal concerns ... or because of the nature of the subject of the litigation...." *Id.* The heightened standard has been applied, for example, where the injunction required the non-movant to give a license to the movant that would continue to be effective even if the non-movant ultimately prevailed. *Id.*

Neither temporal concerns nor the nature of the litigation in this case would render a trial on the merits meaningless. While it is true that the preliminary injunction sought by District 1199 is the same relief it seeks in a permanent injunction, should a preliminary injunction issue it would restrict the defendants from taking certain action only until a trial on the merits could be held. Should the defendants prevail at trial, they would then be able in the future to take action as they had in connection with the March 20, 2001 strike. While a preliminary injunction in this case would affect the relationship of the parties for the next few months, it would not have the type of permanent effect that would give District 1199 all the relief sought or make a trial meaningless. Therefore, District 1199 is not required to meet the heightened standard of showing a clear or substantial showing of likelihood of success. In order to prevail on their motion for a preliminary injunction, District 1199 must establish a likelihood of success on the merits and that, absent an injunction, it will suffer irreparable harm.

**B. Likelihood of Success on the Merits**

District 1199 alleges that, by financing of the costs of replacement workers for struck private sector nursing homes, providing state services to support the employers' ability to withstand a strike, and using the National Guard to provide transportation for replacement workers, the defendants employed State action that interfered with District 1199's rights under the NLRA and such actions are preempted under the Supremacy Clause of the U.S. Constitution.

▮ Under the Supremacy Clause of the U.S. Constitution, state law is preempted when Congress explicitly states an intent to exclude state regulation, when the federal interest in the subject matter regulated is so dominant there is no room for state action, and when the state regulation at issue conflicts with federal law or stands as an obstacle to the accomplishment of its objectives. *Pacific Gas & Elec. Co. v. State Energy Res. Conservation and Dev. Comm'n,* 461 U.S. 190, 203–04, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983); *Fidelity Sav. & Loan Ass'n v. De la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). Although not a source of a federal right by itself, the Supremacy Clause " 'secure[s] federal rights by according them priority whenever they come in conflict with state law.' " *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 107, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989) (quoting *Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 613, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979)). A Supremacy Clause claim is enforceable under Section 1983 of Title 42 of the United States Code when it is based on a statutory violation and the statute in question creates "rights, privileges, or im-

munities" in the plaintiff. *Id.* at 108 n. 4, 110 S.Ct. 444.

Federal labor law creates the rights at issue in this case. "The doctrine of labor law pre-emption concerns the extent to which Congress has placed implicit limits on 'the permissible scope of state regulation of activity touching upon labor-management relations.'" *N.Y. Tel. Co. v. N.Y. State Dep't of Labor,* 440 U.S. 519, 527, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979) (plurality opinion) (quoting *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters,* 436 U.S. 180, 187, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978)). "Cases that have held state authority to be pre-empted by federal law tend to fall into one of two categories: (1) those that reflect the concern that 'one forum would enjoin, as illegal, conduct which the other forum would find legal' and (2) those that reflect the concern 'that the (application of state law by) state courts would restrict the exercise of rights guaranteed by the Federal Acts.'" *Lodge 76, International Ass'n of Machinists and Aerospace Workers v. Wis. Employment Relations Comm'n,* 427 U.S. 132, 136, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976).

The first category of preemption doctrine developed from a line of cases that focused on the primary jurisdiction of the NLRB. *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 244–47, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). *Garmon* and the cases that followed hold that state law is preempted where such state law either prohibited conduct subject to the regulatory jurisdiction of the NLRB under Section 8 of the NLRA or facilitated conduct prohibited by Section 7 of the NLRA. *Id.; Amalgamated Ass'n of Street Elec. Railway & Motor Coach Employees v. Lockridge,* 403 U.S. 274, 290–91, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971).

The second category of preemption doctrine focuses on "whether Congress intended that the conduct involved be unregulated because [such conduct was] left 'to be controlled by the free play of economic forces.'" *Machinists,* 427 U.S. at 140, 96 S.Ct. 2548 (quoting *NLRB v. Nash–Finch Co.,* 404 U.S. 138, 144, 92 S.Ct. 373, 30 L.Ed.2d 328 (1971)). *Machinists* held that:

> ... neither States nor the [NLRB] is 'afforded flexibility in picking and choosing which economic devices of labor and management shall be branded as unlawful.' ... [B]oth are without authority to attempt to 'introduce some standard of properly balanced bargaining power' or to define 'what economic sanctions might be permitted negotiating parties in an ideal or balanced state of collective bargaining.'

*Id.* at 149–50, 96 S.Ct. 2548 (internal citations omitted) (quoting *NLRB v. Ins. Agents Int'l Union,* 361 U.S. 477, 497–98, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960)). That is, states may not "deny[ ] one party to an economic contest a weapon that Congress meant him to have available." *Id.* at 150, 96 S.Ct. 2548. (internal quotation omitted). The "crucial inquiry" under *Machinists* is "whether the exercise of state authority to curtail or entirely prohibit self-help would frustrate effective implementation of the policies of the National Labor Relations Act." *N.Y. Tel.,* 440 U.S. at 531, 99 S.Ct. 1328.

While it is clear under both the *Garmon* and *Machinists* lines of cases that federal labor law preempts state action in certain circumstances, it is also clear that Congress left some power to the States. *Machinists,* 427 U.S. at 136, 96 S.Ct. 2548. "'The [NLRA] leaves much to the states, though Congress has refrained from telling us how much. We must spell out from conflicting indications of congressional will

the area in which state action is still permissible.'" *Id.* (quoting *Garner v. Teamsters, Chauffeurs and Helpers Local Union,* 346 U.S. 485, 488, 74 S.Ct. 161, 98 L.Ed. 228 (1953)). Federal labor law "has not been construed to preclude the States from regulating aspects of labor relations that involve 'conduct touch(ing) interests so deeply rooted in local feeling and responsibility that ... we could not infer that Congress had deprived the States of the power to act.'" *Id.* (quoting *Garmon,* 359 U.S. at 244, 79 S.Ct. 773). Policing of actual or threatened violence to persons or destruction of property is clearly a matter for the States. *See, e.g., Int'l Union, United Auto., Aircraft and Agr. Implement Workers v. Russell,* 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958) (upholding state-court jurisdiction of a common-law tort action against a union to recover compensatory and punitive damages for malicious interference with the plaintiff's lawful occupation). Similarly, the States retain the power to regulate activity that is merely a peripheral concern of the federal labor law. *Garmon,* 359 U.S. at 243, 79 S.Ct. 773.

There is no claim in this case that the defendants' actions prohibited conduct subject to the regulatory jurisdiction of the NLRB under Section 8 of the NLRA or facilitated conduct prohibited by Section 7 of the NLRA. Thus, *Garmon* preemption does not apply to this case. Rather, District 1199 relies on the *Machinists* preemption doctrine and alleges that the conduct of the defendants effectively denied it "a weapon that Congress meant [it] to have available" and thereby intruded on an area of labor law that Congress left for the "free play of contending economic forces." *Machinists,* 427 U.S. at 150, 96 S.Ct. 2548. The defendants respond that they did not deny District 1199 a right protected by federal labor law and, even if their actions did curtail any such right, they were per-

mitted to do so in order to protect the health and safety of the nursing home residents.

■ Under *Machinists,* state or local action is only preempted if it regulates the use of economic weapons that are recognized and protected under the NLRA such that the state or local government has entered "'into the substantive aspects of the bargaining process to an extent Congress has not countenanced.'" *Machinists,* 427 U.S. at 149, 96 S.Ct. 2548 (quoting *NLRB v. Ins. Agents,* 361 U.S. at 498, 80 S.Ct. 419); *see also N.Y. Tel.,* 440 U.S. at 533, 99 S.Ct. 1328. In order to determine whether state action is preempted in this case, the court will examine: 1) whether the state action regulated the use of economic weapons protected by the NLRA; 2) whether, by regulating the use of those weapons, the defendants entered into substantive aspects of the bargaining process; and, if so, 3) whether Congress expected the defendants to interfere in the bargaining process in the manner and to the extent they did.

■ The first issue is whether District 1199 has established a likelihood of success in proving that the state action regulated the use of economic weapons protected by the NLRA. Federal labor law grants the parties to a labor dispute the use of permissible economic tactics, including the right to peacefully strike. *See, e.g., Golden State Transit Corp.,* 493 U.S. at 111, 110 S.Ct. 444; *International Union of United Auto., Aircraft and Agr. Implement Workers v. O'Brien,* 339 U.S. 454, 457, 70 S.Ct. 781, 94 L.Ed. 978 (1950). The right to strike is a "[p]ermissible economic tactic[] that ... employees have a right to use without state infringement." *Rum Creek Coal Sales, Inc. v. Caperton,* 926 F.2d 353, 364 (4th Cir.1991). When it enacted the NLRA in 1974, Congress ex-

plicitly granted nursing home employees the right to strike, with some minimal restrictions. *See* 29 U.S.C. § 158. Congress expressly recognized that nursing home workers have a right to strike, subject only to a ten-day notice. *Id.* at § 158(g). Therefore, because the right to strike is a right specifically protected by the NLRA, District 1199 has established a likelihood of success in proving that the State's actions, at least to some extent, regulated the use of an economic weapon protected by the NLRA because, indisputably, its actions have had some effect upon that right.

The second consideration under *Machinists* is whether, by regulating the use of the economic weapon, the defendants entered into substantive aspects of the bargaining process. The crucial inquiry regarding this issue is whether the exercise of state authority entirely prohibited or substantially curtailed the exercise of a right. *See N.Y. Tel.,* 440 U.S. at 531, 99 S.Ct. 1328 (plurality opinion).

State authority has been found to substantially curtail or entirely prohibit the right to strike where a state action enjoined a lawful labor weapon. For example, in *Machinists,* the right to strike was illegally prohibited when the state enjoined collective action to refuse overtime work. *Machinists,* 427 U.S. at 148–49, 96 S.Ct. 2548. In another case, a state statute was declared preempted when it empowered the Governor to seize a utility and enjoin strikes during that seizure. *Division 1287 of Amalgamated Ass'n of Street, Elec. Ry. v. Missouri,* 374 U.S. 74, 82, 83 S.Ct. 1657, 10 L.Ed.2d 763 (1963). The right to strike was also prohibited where a state court granted a preliminary injunction against any strike action. *NLRB v. State of N.Y.,* 436 F.Supp. 335, 338 (E.D.N.Y.1977).

State action can significantly curtail a right protected by the NLRA even when

such action does not explicitly deny such right. For example, in *Golden State Transit Corp. v. City of Los Angeles,* the City of Los Angeles conditioned the renewal of a taxi company's franchise on its settlement of its contract negotiations with a union by a particular date. 475 U.S. at 609–11, 106 S.Ct. 1395. The Court found that the City's insistence on settlement before approval of the company's franchise renewal application destroyed the balance of power between the parties because the City effectively created a requirement to settle, which the NLRA did not require. *Id.* at 619, 106 S.Ct. 1395. "A local [or State] government . . . lacks the authority to introduce some standard of properly 'balanced' bargaining power or to define what economic sanctions might be permitted negotiating parties in an 'ideal' or 'balanced' state of collective bargaining." *Id.* (internal quotations omitted). Courts have also found an employer's right to hire replacement workers violated by state statutes that precluded or inhibited the hiring of such workers. *Kapiolani Med. Ctr. for Women and Children v. Hawaii,* 82 F.Supp.2d 1151, 1158 (D.Ha.2000); *Charlesgate Nursing Ctr. v. State of R.I.,* 723 F.Supp. 859, 866–67 (D.R.I.1989).

Similarly, in *Derrico v. Sheehan Emergency Hospital,* the Second Circuit held that an employee could not rely on an implied contract theory under state law for enforcing terms of an expired collective bargaining agreement negotiated by a state organization. 844 F.2d 22, 28–29 (2d Cir.1988). The Second Circuit held that "[e]xposure to liability at state law for breach of contract . . . would significantly alter the labor-management relationship that follows expiration of a [collective bargaining agreement]" because it would "artificially limit the parties' post-expiration" economic weapons. *Id.* at 29. In addition, the court held that allowing a collective

bargaining agreement provision to linger after the contract's expiration in the form of an implied contract would "be tantamount to imposing a contract on the parties, a notion anathema to the NLRA." *Id.* The potential for disrupting collective bargaining in this way led the court to conclude that the state law implied contract claim was preempted by the NLRA. *Id.*

Conversely, state action which has some effect upon the bargaining process does not necessarily curtail a right or interfere with the "balance" improperly. For example, in *New York Telephone,* the Supreme Court held that a state statute providing unemployment benefits to striking workers was not preempted. 440 U.S. at 533–46, 99 S.Ct. 1328. The three-judge plurality based its decision in part on the fact that, the "general purport of the program [was] not to regulate the bargaining relationships between the [employers and employees] but instead to provide an efficient means of insuring employment security in the State." *Id.* at 533, 99 S.Ct. 1328.

Similarly, in *Massachusetts Nurses Assoc. v. Dukakis,* the First Circuit upheld a hospital cost containment law because the statute only affected labor-management relations indirectly and affordable health care was an interest deeply rooted in local feeling and responsibility. 726 F.2d 41, 44 (1st Cir.1984). The statute at issue in *Dukakis* established a prospective method of reimbursing hospital costs by projecting estimates of component costs. *Id.* at 42. The First Circuit found that such a statute was different from those which had been found to be preempted by the NLRA because it did not involve "state interference with the rights of labor or management" but affected "the labor-management relationship only indirectly through its regulation of the employers' annual gross income." *Id.* at 43.

There is no claim that the State action in this case explicitly prohibited District 1199 from striking or would so prohibit it in the future. Rather, District 1199 argues that the actions of the State, especially the use of state funds, so effectively diminished the power or impact of its right to strike that the State entered into the substantive aspects of the bargaining power.

The defendants admit, and this court finds that, by providing expedited reimbursement of strike-related costs to the nursing homes, the State affected the impact of District 1199's strike. While the impact of immediate state reimbursement for strike-related costs is not insignificant, the court does not find on the record before it that District 1199 has established a likelihood of succeeding in proving the extent of the effect of the state action on District 1199's right to strike was such as to effectively curtail the effect of the exercise by District 1199 of its right to strike. The state action in this case did not directly prohibit District 1199 from striking. Nor did it create any additional requirements or restrictions on the bargaining process as did the City action in *Golden State* and the implied contract theory in *Derrico.* Instead, the state action, in reimbursing nursing home owners' strike-related expenses under a federally-created program, assisted the nursing homes in using self-help mechanisms available to them under the NLRA, including the use of replacement workers. This is not dissimilar to the assistance given to striking workers in the form of workers' unemployment payments, *see N.Y. Tel.,* 440 U.S. at 533–46, 99 S.Ct. 1328, or to the effect on collective bargaining of prospective reimbursement of hospital costs, *see Dukakis,* 726 F.2d at 43.

Whether such action diminished the power of the strike to such an extent as to enter into the substantive aspects of the

bargaining process is dependent on the impact of the State's involvement on the private nursing homes and the impact of the State's involvement on the strikers. The record currently before the court establishes serious questions regarding the extent of the effect of the State's involvement and thus whether District 1199's right to strike was substantially curtailed by the State's action. However, the record does not support a finding of a likelihood of success on the merits on this issue. The evidence is insufficient to find that the State's actions had the same directly substantial effect as those actions courts have found to interfere in substantive aspects of the bargaining process. *See, e.g., Golden State,* 475 U.S. at 616–19, 106 S.Ct. 1395; *Division 1287,* 374 U.S. at 82, 83 S.Ct. 1657; *Derrico,* 844 F.2d at 28–29. Therefore, the court cannot find that District 1199 has established a likelihood of success on the merits regarding whether, by their involvement, the defendants entered into substantive aspects of the bargaining process.

■ Even if District 1199 established a likelihood of success of proving that the defendants entered into substantive aspects of the bargaining process, District 1199 has failed, at this stage, to establish a likelihood of success in proving that Congress did not expect the defendants to interfere in the bargaining process in the manner and to the extent they did. As discussed above, there are limits to the *Machinists* preemption doctrine. States are permitted to legislate in areas with peripheral impact on matters governed by federal labor law. *Rum Creek Coal Sales, Inc. v. Caperton,* 926 F.2d 353, 364 (4th Cir.1991). "Such areas are those 'of vital local concern such as health or welfare benefits and the prevention of violence or tortious acts.'" *Id.* (quoting *Charlesgate Nursing Center,* 723 F.Supp. at 865).

"[P]reemption should not be lightly inferred in this area, since the establishment of labor standards falls within the traditional police power of the State." *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 21, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987). A State thus remains free to regulate "conduct physically injuring or threatening to persons or property." *Machinists,* 427 U.S. at 151, n. 13, 96 S.Ct. 2548.

Further, governors enjoy a wide range of discretion in exercising the police power of the State. *Sterling v. Constantin,* 287 U.S. 378, 400, 53 S.Ct. 190, 77 L.Ed. 375 (1932). That is not to say that "every sort of action the Governor may take, no matter how unjustified by the exigency or subversive of private rights and the jurisdiction of the courts, otherwise available, is conclusively supported by mere executive fiat." *Id.* In order to be actionable, however, the actions of the Governor or any other executive officer in a discretionary, decision-making position must be taken outside the scope of the position or in gross abuse of official authority. *See, e.g., Scheuer v. Rhodes,* 416 U.S. 232, 248–49, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *abrogated on other grounds, Harlow v. Fitzgerald,* 457 U.S. 800, 814–18, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

In addition to the general deference given to state executive power, there is evidence in this case that, although Congress protected the rights of employees under the NLRA, Congress also intended the States to protect the health and safety of nursing home residents. In *New York Telephone,* the Supreme Court considered how conflicting congressional intentions affect the preemption analysis. 440 U.S. at 533, 99 S.Ct. 1328. The issue in *New York Telephone* was whether a state statute authorizing payment of benefits to strikers was preempted by federal law. *Id.* at 525, 99 S.Ct. 1328. The statute at issue did not

"involve any attempt by the State to regulate or prohibit private conduct in the labor-management field." *Id.* at 532, 99 S.Ct. 1328. It involved a state program for distribution of benefits. *Id.*

A majority of the Court in *New York Telephone* held that the state law was not preempted but did not agree on a basis for that holding. The three-member plurality found the state statute was not preempted because "the general purport of the program [was] not to regulate the bargaining relationships between the two classes," *id.* at 533, 99 S.Ct. 1328, the benefits were dispersed from public funds to effectuate a public purpose, *id.* at 535, 99 S.Ct. 1328, and the state program was structured to comply with a federal statute and financed, in part, with federal funds. *Id.* at 536, 99 S.Ct. 1328. The plurality held that, because Congress had been sensitive to the importance of the States' interest in fashioning their own unemployment compensation programs, it was appropriate to treat the statute with the deference afforded state laws of general applicability that protect interests "deeply rooted in local feeling and responsibility." *Id.* at 540, 99 S.Ct. 1328. In such a case, "in the absence of compelling congressional direction, [the Court] could not infer that Congress had deprived the States of the power to act." *Id.* (internal quotation omitted).

In a concurring opinion, Justice Blackmun, joined by Justice Marshall, agreed that Congress had decided to permit a State to pay unemployment benefits to strikers and, therefore, the State law was not preempted, but disagreed that "compelling congressional direction" to deprive a State of the power to act was necessary to find preemption. *Id.* at 548–49, 99 S.Ct. 1328 (Blackmun, J. concurring) ("[w]here evidence of congressional intent to tolerate a State's significant alteration of the balance of economic power is lacking, *Machinists* might still require a holding of pre-emption notwithstanding the lack of compelling congressional direction that the state statute be pre-empted").[13]

The challenge faced by the *New York Telephone* Court is present here. Under both Title XIX and Connecticut state law, the State has an interest in insuring that an appropriate level and quality of care is maintained in nursing homes without regard to labor disputes. The general purpose of Connecticut General Statute § 17b–340 is to reimburse nursing homes for the costs incurred in caring for those residents who are on Medicaid and, effectively, are the responsibility of the State. As in *New York Telephone*, the statute and the State's actions thereunder are not directed at labor-management relations.

Further, Title XIX of the Social Security Act provides that the federal Medicaid program is to be implemented at the state level pursuant to federal laws and regulations. 42 U.S.C. §§ 1396–1396v. Title XIX is one of many programs funded by Congress to provide "physical and mental health [and] . . . [f]ull restorative services for those who require institutional care." 42 U.S.C. § 3001. Pursuant to Title XIX, Connecticut devised a statutory scheme to

---

**13.** The dissent found the state statute to be preempted under *Machinists* because it did not fall under the "local feeling and responsibility" exception to preemption and because there was no evidence of clear congressional intent to alter the policy of the NLRA. *N.Y. Tel.*, 440 U.S. at 560, 99 S.Ct. 1328 (Powell, J., dissenting). Both the concurrence and the dissent thought that, by requiring the petition-

ers to demonstrate clear congressional intent to deprive the State of its power, the plurality put the burden on the wrong side. "The crucial inquiry is whether the exercise of state authority 'frustrate[s] effective implementation of the [NLRA's] processes,' not whether the State's purpose was to confer a benefit on a class of citizens." *Id.* at 550, 99 S.Ct. 1328 (Blackmun, J., concurring).

implement the Medicaid program. By reimbursing strike-related costs for Medicaid patients, the defendants were acting, at least in part, pursuant to a federal policy delegating power to the States. In addition, while Congress did not explicitly give states the power to fund strike-related costs, Congress demonstrated some intention of altering the balance of power under the NLRA in order to protect the health and safety of nursing home residents by requiring notice requirements for strikers of health care facilities.

Unlike *New York Telephone,* the State in this case was purportedly involved in actions that affected the bargaining process in order to protect the health and safety of a third party, the nursing home residents. "Given the vulnerable state of the residents of the nursing homes should there be a cessation of services by those who are charged with their care, ... NLRA supremacy over the economic rights of the unionized employees does not strip the State of its residual powers to protect the lives and health of those residents." *NLRB v. State of N.Y.,* 436 F.Supp. 335, 339 (E.D.N.Y.1977). Thus, "[w]hile the State may not prohibit the employees from going out on strike, ... when it appears that the lives and health of nursing home residents are threatened, the State remains free, in the exercise of its local responsibility, to take whatever reasonable steps are necessary to protect the residents from the effects of strike activity." *Id.* As the Supreme Court noted, despite the strength of the doctrine of federal preemption in labor law, "nothing [the Supreme Court has] said even remotely affects ... the right or duty of the chief executive or legislature of a State to deal with emergency conditions of public danger, violence, or disaster under appropriate provisions of the State's organic or statutory law." *Division 1287 of Amalgamated Ass'n of Street, Elec. Ry. v. Mis-*

*souri,* 374 U.S. 74, 83, 83 S.Ct. 1657, 10 L.Ed.2d 763 (1963).

District 1199 argues that neither the Governor nor DSS acted "to avoid an immediate negative impact on the health and safety of patients." Conn. Gen.Stat. § 17b–340(a). District 1199 alleges that the defendants were motivated instead by the State's own financial interest in keeping the labor costs of nursing homes down and, therefore, worked to lessen the impact a strike would have on the nursing homes rather than use other statutory options available. District 1199 argues that the defendants' actions were not reasonably necessary to protect the health and safety of nursing home residents, interfering in the substantive bargaining process in a manner that Congress did not expect or approve, and such actions are preempted.

The defendants respond that the Governor acted within his authority in using the state National Guard to protect the health and safety of nursing home residents and that DSS acted under Connecticut General Statute § 17b–340 to reimburse costs to nursing homes, which reimbursements were reasonably necessary to protect the health and safety of the nursing home residents. Under Connecticut General Statute § 17b–340, rates paid by the State are determined on a "basis of a reasonable payment of such necessary services" and "shall include ... reasonable costs mandated by collective bargaining agreements." Conn. Gen.Stat. § 17b–340(a). Further, "[t]he commissioner may, in his discretion, allow the inclusion of extraordinary and unanticipated costs of providing services which were incurred to avoid an immediate negative impact on the health and safety of patients." *Id.* The defendants maintain that they acted within the purview of this statute to protect the health and safety of nursing home resi-

dents and that Congress does not expect states to leave nursing home residents at risk.[14]

Based upon its concern about the number of nursing homes with staff prepared to strike given the shortage of qualified replacement workers and its concern that moving residents would be both impractical and ineffective because of the number of homes and residents involved, DSS chose the course it did. DSS viewed an organized plan, funded by DSS as to the Medicaid portion, to obtain replacement workers as the best means to assure the health and safety of the residents. Starkowski testified that stopping admissions or transferring residents would not have provided sufficient relief and, because nursing home admissions are currently low, taking such action would have further jeopardized the financial condition of some of the homes involved. In addition, according to Starkowski, the appointment of receivers for the number of homes involved would have been ineffective in addressing the need to secure replacement for the striking workers.

Although the defendants gave cursory considerations to other options available to the State for protecting nursing home residents, Starkowski and other representatives from DSS did not consider the impact of a one-day strike on each nursing home individually and did not make any differentiation in the assistance provided to homes based on the homes' ability to pay or to provide for the health and safety of its residents without the State's involvement. In other words, the defendants did not assess whether the health, safety, and welfare of the residents were at risk in each home for which DSS made expedited reimbursements of strike-related expenses, but instead made an overall determination of the necessary state response to a strike at forty nursing homes. Despite these questions about the State's conduct, District 1199 has not established a likelihood of succeeding at trial in establishing a lack of a reasonable connection between the interest of the State in protecting the health and safety of nursing home residents and the State's actions.

Although there are questions about whether the State action was disproportionate to the threat faced, the court cannot conclude on the record before it that District 1199 is likely to be able to establish the lack of a reasonable connection between the State's actions and its purported concern for health and safety. While the court does not accept the State's view that the homes faced "unprecedented" strike action and despite the defendants' minimal consideration of other options, the record is not sufficient for the court to conclude that District 1199 has established a likelihood of success in prov-

14. District 1199 does not appear to argue that the state action in this case is not authorized by Conn. Gen.Stat. § 17b–340. Rather, it appears to focus its claim upon the argument that the type of action at issue here is preempted under *Machinists* in the circumstances of this case. *See* Complaint for Injunctive and Declaratory Relief and Application for Temporary Restraining Order and Preliminary Injunction [Dkt. No. 1], at ¶¶ 39, 43. Given the complexity of the statutory and regulatory scheme at issue and District 1199's apparent acceptance, for purposes of its preliminary injunction motion, that the State's actions at issue were authorized by Connecticut statute, the court has assumed for the purposes of its preemption analysis that the State is correct.

If District 1199 is challenging the actions of the defendants as not authorized under the statute, and such a challenge requires interpretation of the statute, the court invites further submissions by the parties as to whether certification is appropriate and, if so, what question this court would certify to the Connecticut Supreme Court for interpretation in aid of final resolution of this action. *See* Conn. Gen.Stat. § 51–199b.

ing that the State's actions were not "reasonable steps [ ] necessary to *protect the residents* from the effects of strike activity." *NLRB v. State of N.Y.*, 436 F.Supp. at 339 (emphasis added). The record is also insufficient at this stage to support the conclusion that the State's asserted concern, the health and safety of the residents, was not the sole or primary purpose for its reimbursement of strike-related costs and its use of the state National Guard. Although the State's financial interest might support an inference that its interest was something other than the protection of health and safety, it is not sufficient by itself for this court to so conclude at this preliminary injunction stage.

Recognizing the deference this court should accord to the State's executive branch in light of the State's interest in protecting the health and safety of nursing home residents, the court cannot find on the record before it that District 1199 has established a likelihood of success that the State's action was not "conduct touch(ing) interests so deeply rooted in local feeling and responsibility that ... [the court] could not infer that Congress had deprived the States of the power to act." *Machinists*, 427 U.S. at 136, 96 S.Ct. 2548. District 1199 has thus not established a likelihood of success on the merits of its preemption claim.

Because the court concludes that District 1199 has failed to establish a likelihood of success on the merits of its preemption claim, the court will not address whether District 1199 has established irreparable harm.

## III. CONCLUSION

For the foregoing reasons, the plaintiff's Motion for Preliminary Injunction [Dkt. No. 1] is DENIED. Because of the serious public issues raised by this action, and that there do appear to be questions going to the merits, the court intends to try this matter within the next six to eight months. A scheduling conference will be held on April 27, 2001 at 12:00. The parties are to confer before that conference on scheduling discovery and other pre-trial matters.

**SO ORDERED.**