**NEW ENGLAND HEALTH CARE EMPLOYEES UNION, DISTRICT 1199, SEIU/AFL—CIO, Plaintiff,**

v.

**Honorable John G. ROWLAND, Governor of State of Connecticut, individually and in his official capacity, et al., Defendants.**

No. Civ.A. 3–01–CV–464(JCH).

United States District Court,
D. Connecticut.

May 7, 2002.

John M. Creane, Michael E. Passero, Law Offices of John M. Creane, Milford, CT, for plaintiff.

Gary S. Starr, Sheila Huddleston, Brian Clemow, Gabriel Joseph Jiran, Shipman & Goodwin, Hartford, CT, James K. Robertson, Jr., Carmody & Torrance, Waterbury, CT, for defendants.

## RULING ON DEFENDANTS' MOTION FOR MOTION FOR SUMMARY JUDGMENT [DKT. NO. 57]

HALL, District Judge.

In this action, the plaintiff, New England Health Care Employees Union, District 1199, SEIU/AFL—CIO ("District 1199"), seeks injunctive relief, a declaratory judgment, and damages allegedly arising from the conduct of the defendants, the Honorable John G. Rowland, individually and in his official capacity as Governor

of the State of Connecticut, and Patricia Wilson–Coker, in her official capacity as Commissioner of the Department of Social Services ("defendants"), in connection with strikes by members of the plaintiff. District 1199 alleges that the defendants' use of state power in connection with an ongoing labor dispute and strike between District 1199 and Connecticut nursing homes violated its members' First Amendment rights and interfered with its members' rights protected by the National Labor Relations Act ("NLRA"). The action is brought pursuant to 42 U.S.C. § 1983.

Pending before the court is the defendants' Motion for Summary Judgment [Dkt. No. 57]. The defendants argue that their actions did not interfere with the rights of District 1199's members, that their actions were not preempted by the NLRA, that Governor Rowland's actions did not violate District 1199's First Amendment rights, and that Governor Rowland is entitled to qualified immunity for the claims against him in his individual capacity. The court will address each argument in turn.

## I. FACTUAL BACKGROUND

District 1199 represents approximately 7000 union members who are employed at seventy-one nursing homes in Connecticut. These members are employed as registered nurses, licensed practical nurses, nurses' aides, and housekeepers and in maintenance, laundry, clerical, and other positions. The State of Connecticut currently has licensed approximately 250 nursing homes, with 30,000 licensed nursing-home beds.

The State and the Governor have an obligation to protect and ensure the health and welfare of the nursing-home residents. Connecticut nursing homes are regulated by the State of Connecticut under the auspices of the Department of Public Health ("DPH"). DPH establishes and monitors the level of care and staffing required to maintain the safety, health, and welfare of nursing-home residents. Conn.Gen.Stat. §§ 19a–493, 19a–496. DPH is responsible, under state statute, for assessing the care and services provided to nursing-home residents in order to determine whether nursing homes properly care for their residents' health, safety, and welfare. *Id.*

Approximately seventy-five percent of the residents in the nursing homes affected by the strikes at issue in this case are covered by the federal Medicaid program. *See* 42 U.S.C. §§ 1396–1396v. The State, through its Department of Social Services ("DSS"), reimburses nursing homes for the cost of the food, shelter, and medical care of those residents covered by Medicaid.

In February 1999, during the last significant round of negotiations between the nursing homes and District 1199, District 1199 sent out ten-day strike notices to forty-seven nursing homes with whom its contracts had expired. Prior to the strike, the Governor announced that he was proposing an approximately $200 million increase in funds for wages and benefits in the nursing-home industry. While the announcement averted strikes at most nursing homes, District 1199 did strike some nursing homes where contracts could not be negotiated. DSS received and processed, on an *ad hoc* basis, special Medicaid reimbursement requests from nursing homes for strike-related costs attributable to the Medicaid portion of their population. The strike-related reimbursements included non-refundable deposits for replacement workers and security.

Aware that contracts between District 1199 and fifty-one nursing homes would expire in March 2001, state officials held meetings within state agencies beginning as early as September 2000 to discuss concerns about contingency plans to pro-

tect the health and safety of residents at the nursing homes involved. State officials also met with some nursing-home owners and with representatives of the nursing home owners' association. They also met once with union representatives.

Long before strike notices were issued, state officials determined that state contingency plans were necessary because the Governor would not recommend increases in Medicaid appropriation similar to those that ended the 1999 strikes and because the individual nursing homes' ability to serve their residents was subject to disruption by a number of factors beyond the control of the homes' owners. Factors considered by the defendants,[1] which could prevent the nursing-home owners from providing adequate care, included the availability, reliability, and appropriate licensure of replacement workers; the availability of adequate transportation to get the replacement workers to sites where they were needed; the vagaries of weather or other problems that could delay replacement workers traveling to Connecticut from distant locales; the financial plight of many of the nursing homes with expiring labor contracts; the lack of census in many of the nursing homes; and the need to coordinate among the nursing homes struck given the large number of workers and residents involved.

In December 2000, DSS contacted the Health Care Financing Administration ("HCFA"), the federal agency overseeing Medicaid, to determine whether strike-related, nursing replacement expenses to deal with the strike contingency would be reimbursable costs under the Medicaid program. Based on the information provided by DSS, the HCFA official respond-

ed informally that the expenses should be reimbursable.

On February 7, 2001, Governor Rowland submitted a supplemental budget to the legislature that included a $5,000,000 line item to cover contingency planning costs of state agencies and nursing homes. These contingency planning costs, which included the worker replacement expenses, were in anticipation of possible nursing-home strikes by District 1199 following expiration of its contracts.

On the same day the supplemental budget was submitted, DSS sent a memo to nursing homes with expiring union contracts notifying them of DSS's intention to immediately reimburse the Medicaid portion of any strike-related costs, including worker replacement costs, as "extraordinary and unanticipated costs." Defs.Exh. M. In the view of DSS, strike-related costs are allowable costs under Connecticut General Statutes § 17b–340. To that end, the February 7, 2001 memo advised nursing-home owners what extraordinary expenses would be considered immediately reimbursable in the event of a potential strike or job action. DSS did not promise to reimburse all strike-related costs, but only those costs that were "extraordinary and necessary for the health and safety of residents." *Id.* at 1. The memo advised the nursing homes how DSS would reimburse extraordinary or unanticipated costs to avoid an immediate negative impact on the welfare, health, and safety of the nursing-home residents. The memo further notified the nursing homes that they had to comply with the obligations of the NLRA. It also stated that DSS reserved the right to recover all or, if appropriate, a portion of the expedited reimbursement should the National Labor Relations Board ("NLRB")

---

1. In referring to the "defendants," the court includes their agents, such as responsible state agency officials.

determine that a nursing home engaged in unfair labor practices.

In addition to DSS's assessment and plan, the Office of Emergency Management ("OEM"), the state agency responsible for planning, implementation, and management of the State's response to actual or potential natural disasters, public emergencies, or threats to the health, safety, and welfare of the citizens of Connecticut or to their property, facilitated meetings among affected state agencies and developed a comprehensive plan for responding to the potential strikes at the *affected* nursing homes, as well as at group homes run by other state agencies. The Comprehensive Health Care Support Plan was designed to be implemented in the event that the nursing homes or group homes proved unable to provide the continuous, uninterrupted level and quality of care and services required by the nursing or group home residents.

From January through March 20, 2001, District 1199 met with nineteen nursing-home owners operating fifty-one nursing homes in an effort to negotiate successor contracts to agreements that expired on March 15, 2001. Those negotiations failed to result in any successor contracts by March 20, 2001.

On or about March 6, 2001, District 1199 gave written notification to forty-one of the fifty-one nursing homes of District 1199's intention to strike on March 20, 2001, beginning at 6:00 a.m.[2] District 1199 scheduled the strike to protest the lack of progress in negotiating new contracts and the owners' unwillingness to increase staffing in their nursing homes. On or about March 15, 2001, District 1199 withdrew its strike notice from one of the nursing homes. On or about March 16, 2001, District 1199 advised the nursing-home own-

ers in writing that it intended its strike to last only twenty-four hours.

Approximately 4000 employees would be engaged in the work stoppage at the forty nursing homes receiving strike notices. Those forty nursing homes house approximately 5200 residents who receive care twenty-four hours a day, seven days a week. Most of these nursing-home residents require constant supervision, assistance with personal care, multiple medications at varying times, and special diets; many are immobile or require assistance with mobility; many are mentally incompetent; and many require special medical equipment.

District 1199 communicated to local police officials that they intended to obey the lawful orders of the police. On or about March 7, 2001, Jerome P. Brown ("Brown"), President of District 1199, met with Lieutenant Colonel Timothy Barry ("Barry") of the Connecticut State Police to discuss District 1199's strike plans. At that time, Brown expressed District 1199's intention to conduct peaceful, orderly picket lines.

After being notified of the strike, various nursing-home owners, through the Connecticut Association of Health Care Facilities ("CAHCF"), entered into contracts for replacement workers with U.S. Nursing Corporation, a company located in Colorado. The nursing homes notified District 1199 that they intended to continue to provide services to nursing-home residents and that they would bring in replacement workers. Also, on or about March 15, Brown and District 1199 obtained a copy of the February 7, 2001 memo from DSS to the nursing homes concerning reimbursement for strike-related expenses.

---

**2.** Under the NLRA, as amended, District 1199 is required to give a ten-day notice to nursing-home owners of its intention to engage in a strike. *See* 29 U.S.C. § 158(g).

On March 20, 2001, at 6:00 a.m., the District 1199 and its members engaged in a strike at forty nursing homes. No violence occurred during the strike. At the end of the one-day strike, on March 21, 2001, sixteen of the struck nursing homes refused to permit their striking employees to return to work. On March 22, 2001, fifteen nursing homes refused to permit their striking employees to return to work. On March 23, 2001, thirteen nursing homes refused to permit striking employees to return to work and continued such refusal until Sunday, March 25, 2001, at 6:00 a.m. Approximately 1844 patients resided in the thirteen nursing homes that refused to permit their employees to return to work. On March 20, 2001, and on the succeeding days when some District 1199 members were locked out, members of District 1199 and their supporters peacefully picketed the nursing homes.

Starting on March 14, 2001, six days before the announced strike date, DSS made expedited payments to nursing homes to enable them to meet their estimated extraordinary expenses. On March 14, 2001, DSS made payments totaling $2 million to cover any strike-preparation costs. In the end, the expedited payments totaled $4,561,000.

As part of the comprehensive plan developed by the State, and on the order of the Governor, three National Guard units were activated. During the course of the March 20, 2001 strike and the succeeding days when some members of District 1199 were locked out by nursing-home owners, non-uniformed members of one National Guard unit drove vans to transport non-striking nursing-home employees and replacement workers to and from struck nursing homes. Also, National Guard members served as emergency medical personnel in the event strike replacements were not available. The National Guard was not otherwise present in any capacity during picketing by District 1199 members and supporters.

During the course of the March 20, 2001 strike and the succeeding days when members of District 1199 were locked out, and pursuant to the comprehensive plan, Connecticut State Police troopers were assigned to perform traffic, crowd control, and related security functions at the four nursing homes located in communities without local police departments.[3] They also escorted replacement workers and worked with local police departments, as requested.

Prior to the March 20, 2001 strike, the Connecticut Department of Transportation ("DOT"), pursuant to the comprehensive plan, identified parking facilities on state-owned property where non-striking nursing-home employees and replacement workers could park and be transported to and from nursing homes affected by the strike. Also, DOT leased fifty commuter vans at a cost of approximately $200,000 to be available to transport replacement or non-striking workers from the state parking areas in the event the nursing homes or their contractors were unable to do so. During the course of the March 20, 2001 strike, and the succeeding days when some members of District 1199 were locked out by the nursing-home owners, at least some of those vans were used for that purpose.

In late April 2001, District 1199 again sent out ten-day strike notices for strikes to commence May 1, 2, and 3. In anticipation of the May 2001 strikes, DSS request-

---

**3.** State police normally provide law enforcement for communities without an established police force. *See* Conn.Gen.Stat. § 29–5. Also, the mandate of the state police requires that they provide statewide law enforcement, outside Connecticut cities and boroughs. *See* Conn.Gen.Stat. § 29–7.

ed that nursing homes provide financial information so DSS could determine whether the nursing homes needed expedited payments for strike-related expenses. The Certificate of Need unit in DSS attempted to analyze the financial needs of the nursing homes to determine whether each of them needed advance payments in order to secure replacement workers.[4]

On May 14, 2001, during the May strikes, District 1199 convened a statewide meeting to discuss in part the ongoing strike. At the meeting, District 1199 members resolved to return to work, despite the lack of operative contracts. District 1199 issued written offers to return to work, which were rejected by most of the nursing-home owners involved. Some District 1199 members were locked out until June 7, 2001.

During the May strikes, DPH, DSS, and the State Police operated twenty-four hours a day, seven days a week. The roles of the DOT and the National Guard for that period were reduced. After May 14, the defendants continued to advance funds to the nursing homes for replacement workers. The Connecticut legislature subsequently approved a budget that increased Medicaid funding by $19 million and allocated $25 million to strike-related expenses incurred by the State.

## II. DISCUSSION

Summary judgment is only appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir.2000). The burden of showing that no genuine factual dispute exists rests upon the moving party. *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 133 (2d Cir. 2000) (citing *Gallo v. Prudential Residential Servs., Ltd. P'hip*, 22 F.3d 1219, 1223 (2d Cir.1994)). In assessing the record to determine if such issues do exist, all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 721 (2d Cir.1994). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. When reasonable persons, applying the proper legal standards, could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury. *Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir.2000).

### A. Unlawful Interference and Preemption Claims[5]

District 1199's complaint claims that the NLRA preempted the defendants' actions with regard to the nursing-home strikes. The Supreme Court has recognized that

---

**4.** The unit also does post-strike audits of expenses incurred during the strike period and determines which expenses will be allowed. If DSS provided funds in excess of allowable reimbursement expenses, those overpayments will be recouped as part of future DSS payments.

**5.** The court consolidates consideration of District 1199's first two counts because the Sec-

ond Count would not be a cognizable cause of action independently. *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 106–08, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989) (recognizing a cause of action under § 1983 for NLRA preemption of state action, but noting that the Supremacy Clause itself is not an independent source for a federal cause of action).

Congress, in enacting the NLRA, manifested an unambiguous intent to supplant some aspects of state law that affect labor relations. *Bethlehem Steel Co. v. N.Y. State Labor Relations Bd.*, 330 U.S. 767, 771–76, 67 S.Ct. 1026, 91 L.Ed. 1234 (1947). However, since the NLRA "leaves much to the states [and] Congress has refrained from [indicating] how much[, courts] must spell out from conflicting indications of congressional will the area in which state action is still permissible." *Garner v. Teamsters, Chauffeurs & Helpers Local Union*, 346 U.S. 485, 488, 74 S.Ct. 161, 98 L.Ed. 228 (1953).

The relevant preemption doctrine in this case [6] focuses on "whether Congress intended that the conduct involved be unregulated because [such conduct was] left to be controlled by the free play of economic forces.'" *Lodge 76, Int'l Ass'n of Machinists and Aerospace Workers v. Wis. Employment Relations Comm'n*, 427 U.S. 132, 140, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976) (quoting *NLRB v. Nash–Finch Co.*, 404 U.S. 138, 144, 92 S.Ct. 373, 30 L.Ed.2d 328 (1971)). *Machinists* held that:

neither States nor the [NLRB] is "afforded flexibility in picking and choosing which economic devices of labor and management shall be branded as unlawful." . . . [B]oth are without authority to attempt to "introduce some standard of properly 'balanced' bargaining power" or to define "what economic sanctions might be permitted negotiating parties

in an ideal 'or balanced' state of collective bargaining."

*Id.* at 149–50, 96 S.Ct. 2548 (citations omitted) (quoting *NLRB v. Ins. Agents' Int'l Union*, 361 U.S. 477, 497, 500, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960)). That is, states may not "deny[ ] one party to an economic contest a weapon that Congress meant him to have available." *Id.* at 150, 96 S.Ct. 2548. (internal quotation omitted). The "crucial inquiry" under *Machinists* is "whether the exercise of state authority to curtail or entirely prohibit self-help would frustrate effective implementation of the policies of the National Labor Relations Act." *N.Y. Tel. Co. v. N.Y. State Dep't of Labor*, 440 U.S. 519, 531, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979) (plurality opinion).

Under *Machinists*, "States are therefore prohibited from imposing additional restrictions on economic weapons of self-help . . . unless such restrictions presumably were contemplated by Congress." *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 614–15, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986). In order to determine whether state action is preempted in this case, the court will examine: 1) whether the state action regulated the use of economic weapons protected by the NLRA; 2) whether the state action alters the economic balance between labor and management; and 3) whether Congress expected the defendants to interfere in the bargaining process in the manner and to the extent they did.[7]

---

**6.** In its prior Ruling [Dkt. No. 28], the court described more fully the two categories of preemption under the NLRA and explained that the preemption recognized in *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), does not apply to this case. *New England Health Care, Employees Union, Dist. 1199 v. Rowland*, 170 F.Supp.2d 199, 212 (D.Conn.2001).

**7.** District 1199 has the burden of proof on all elements. However, proof of the first two

elements, which establish a prima facie conflict between state regulation and federal labor law, raises a rebuttable presumption that Congress intended to preempt state law absent an exception to preemption or evidence of Congress's intent not to preempt state law in a particular case. *See N.Y. Tel.*, 440 U.S. at 548–49, 99 S.Ct. 1328 (Blackmun, J., concurring), 566–67 (Powell, J., dissenting); *see also Livadas v. Bradshaw*, 512 U.S. 107, 117 n. 11, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994); *Bldg.*

### 1. State Regulation

■ The court initially notes that federal labor law grants the parties to a labor dispute the use of permissible economic tactics, including the right to peacefully strike. *E.g., Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 111, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989); *Auto. Workers v. O'Brien*, 339 U.S. 454, 457, 70 S.Ct. 781, 94 L.Ed. 978 (1950); *NLRB v. N.Y.*, 436 F.Supp. 335, 338–39 (E.D.N.Y. 1977). The right to strike is a "[p]ermissible economic tactic[ ] that ... employees have a right to use without state infringement." *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 364 (4th Cir.1991). When it amended the NLRA in 1974, Congress explicitly granted nursing-home employees the right to strike, subject only to a ten-day notice. *See* 29 U.S.C. § 158(g). Therefore, the court concludes that District 1199's activities were protected under the NLRA.

In response to a distinction in the case law drawn by District 1199's Opposition, the defendants argue that their actions did not regulate District 1199's activities because the defendants' actions were proprietary in nature and, thus, subject to the market participant exception to *Machinists* preemption. In *Boston Harbor*, the Supreme Court instructed that state action subject to the market participant exception would not be considered state regulation for purposes of the preemption doctrine, even if the state action impacted zones of protected activity. *Bldg. & Constr. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218, 227, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993) [hereinafter *Boston Harbor*]. The *Boston Harbor* Court focused on actions taken by the state in its role as proprietor or purchaser, as opposed to its role as regulator. *Id.* at 229, 113 S.Ct. 1190.

In this case, the defendants argue that their actions were proprietary in nature because the DSS purchased the services of privately owned nursing homes on behalf of Medicaid-benefits recipients. The defendants claim that District 1199's strikes threatened to disrupt the services purchased by the State and, accordingly, justified the State reimbursing strike-related expenses to insure uninterrupted services.

The defendants' actions, however, are distinguishable from the *Boston Harbor* market participant exception. In this case, the defendants acted pursuant to government obligations to provide Medicaid benefits. *See* 42 U.S.C. §§ 1396 *et seq.* The State satisfies those obligations according to federal and state statutes, regulations, and policies. *E.g., id.;* 42 C.F.R. § 430.0 *et seq.;* Conn.Gen.Stat. § 17b–220 *et seq.* Therefore, unlike the "purely proprietary" interests of the defendants in *Boston Harbor*, the defendants in this case acted in accordance with government objectives regarding medical assistance programs.

The court notes that the defendants' actions did not regulate District 1199's conduct in any direct sense. However, the Supreme Court, in *New York Telephone*, recognized that NLRA preemption cannot focus solely on the conduct regulated, but must also consider "the scope, purport, and impact of the state program." *N.Y. Tel. Co. v. N.Y. State Dep't of Labor*, 440 U.S. 519, 532 n. 21, 99 S.Ct. 1328, 59

& *Constr. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218, 226, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993) ("[T]he *Machinists* rule created a zone free from all regulations, whether state or federal."). Accordingly, the defendants have the burden of production for any exception to preemption or evidence of congressional intent not to preempt their actions in this case.

L.Ed.2d 553 (1979) (plurality opinion); *accord Livadas v. Bradshaw*, 512 U.S. 107, 119, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994). In this case, the defendants acted within a regulatory scheme that focused on insuring the health and safety of the public, not on regulating the bargaining relationship between labor and management.[8] Yet, that regulatory scheme and the defendants' policy decisions within that scheme had a discernible impact on the labor-management relationship. Since the defendants' policy decisions constitute regulation and that regulation had an effect on District 1199's protected activities, the court must determine whether the defendants' actions altered the economic balance between labor and management as established by the NLRA.

2. Economic Balance

By enacting the NLRA, Congress established a structure for labor disputes that it implicitly intended to preempt state action. *Machinists*, 427 U.S. at 145–46, 96 S.Ct. 2548; *Local 20, Teamsters, Chauffeurs & Helpers Union v. Morton*, 377 U.S. 252, 258–59, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964). "Congress struck the balance ... between the uncontrolled power of management and labor to further their respective interests.'" *Morton*, 377 U.S. at 259, 84 S.Ct. 1253 (quoting *Local 1976, United Bhd. of Carpenters v. NLRB*, 357 U.S. 93, 100, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958)) (alteration in original). Within the structure established by the NLRA, Congress intended that any conduct left unregulated be "controlled by the free play of economic forces." *Machinists*, 427 U.S. at 140, 96 S.Ct. 2548 (quoting *NLRB v. Nash–Finch Co.*, 404 U.S. 138, 144, 92 S.Ct. 373, 30 L.Ed.2d 328 (1971)) (internal quotation omitted); *accord Metro. Life Ins. Co. v. Mass.*, 471 U.S. 724, 750–51, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985); *Garner v. Teamsters, Chauffeurs & Helpers Local Union*, 346 U.S. 485, 500, 74 S.Ct. 161, 98 L.Ed. 228 (1953) ("For a state to impinge on the area of labor combat designed to be free is quite as much an obstruction of federal policy as if the state were to declare picketing free for purposes or by methods which the federal Act prohibits.").

■ However, not all state action that affects the labor-management relationship would "frustrate the effective implementation of the policies of the [NLRA]." *N.Y. Tel. Co. v. N.Y. State Dep't of Labor*, 440 U.S. 519, 531, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979) (plurality opinion). Only state action that alters the economic balance between labor and management would be subject to preemption.[9] *Id.* at 531–32, 99

---

8. The plaintiff argues that the analysis in *New York Telephone*, which emphasized that the defendant did not attempt to regulate or prohibit private conduct in the labor-management field, does not apply to this case because the defendants intended its actions to assist the nursing homes. Pl.Memo. in Opp. [Dkt. No. 63], at 7 n. 1. Focusing on the defendants' subjective motivations, however, fails to add any meaningful issue to this case because the ultimate issue—whether Congress intended to permit the defendants' actions—remains. *Cf. Legal Aid Soc'y v. City of New York*, 114 F.Supp.2d 204, 237 (S.D.N.Y.2000) (noting that preemption should focus on the objective effects of state regulation to avoid different results for different state actors and citing circuits other than the Second Circuit for a similar holding).

9. This court previously described the above standard as requiring that the state action "substantially curtail[ ] the exercise of a right." *New England Health Care, Employees Union, Dist. 1199 v. Rowland*, 170 F.Supp.2d 199, 213 (D.Conn.2001). After further review of the case law, the court relies on the alternative articulation of the standard—whether the state action alters the economic balance between labor and management—because that standard succinctly incorporates the policies of the NLRA, which must also be considered in the analysis.

S.Ct. 1328; *Metro. Life,* 471 U.S. at 750, 105 S.Ct. 2380.

State action that subsidizes economic self-help during a labor dispute alters the economic balance. *See N.Y. Tel.,* 440 U.S. at 531–32 & n. 20, 99 S.Ct. 1328 (plurality opinion); *Super Tire Eng'g Co. v. McCorkle,* 416 U.S. 115, 123–24, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974) ("It cannot be doubted that the availability of state welfare assistance for striking workers in New Jersey pervades every work stoppage, affects every existing collective-bargaining agreement, and is a factor lurking in the background of every incipient labor contract."); *Mass. Nurses Ass'n v. Dukakis,* 726 F.2d 41, 43 n. 2 (1st Cir.1984) (observing that "giving strikers financial assistance far more intimately and directly affects the balance of forces in a collective bargaining context than the general hospital cost containment approach [at issue in that case]"); *cf. Ohio Bureau of Employment Servs. v. Hodory,* 431 U.S. 471, 492, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977) (accepting a District Court's characterization of state unemployment compensation as a subsidy within the strike-lockout context). Therefore, the court concludes that state subsidies in the form of Medicaid payments and state resources, such as services of the National Guard, parking areas, and transportation vehicles, altered the economic balance between labor and management in this case.

### 3. Intent of Congress

"The question, of course, is whether Congress, explicitly or implicitly, has ruled out such assistance in its calculus of laws regulating labor-management disputes." *Super Tire,* 416 U.S. at 124, 94 S.Ct. 1694. The defendants argue that it was the intent of Congress for the NLRA to tolerate the defendants' actions in this case. The defendants claim that the conflicting directives for nursing homes, as reflected in the NLRA and Title XIX of the Social Security Act, regulating the Medicaid program, illustrate congressional intent to permit the defendants' actions. Alternatively, the defendants argue that their actions touch interests so deeply rooted in local feeling and responsibility that the court cannot infer that Congress intended to deprive states of the power to act as the defendants did. The plaintiffs argue that Congress has not contemplated and approved states' use of the Medicaid scheme to subsidize nursing homes during strikes. Further, they contend that the local interest exception does not apply in this case and may not apply to cases of *Machinists* preemption generally.

#### a. Medicaid and the NLRA

Under Title XIX and Connecticut state law, the State is charged with protecting the health and welfare of its indigent elderly. *E.g.,* 42 U.S.C. § 3001 ("[I]t is the joint and several duty and responsibility of the governments of the United States, of the several states and their political subdivisions ... to assist our older people to secure ... physical and mental health ... [and][f]ull restorative services for those who require institutional care."). Accordingly, the State has an interest in insuring that an appropriate level and quality of care is maintained in nursing homes without regard to labor disputes.

The State's obligations, however, do not provide a wholesale justification for direct interference with District 1199's lawful labor activities. *NLRB v. N.Y.,* 436 F.Supp. 335, 338–39 (E.D.N.Y.1977); *N.Y. v. Local 144, Hotel, Nursing Home & Allied Health Servs. Union,* 410 F.Supp. 225, 228–29 (S.D.N.Y.1976). Congress considered the impact on patients of allowing employees of nursing home and other critical care facilities to strike and explicitly rejected efforts to insulate state laws, which prohibited strikes by and lockouts of health-care workers, from preemption

based on the concerns about patients. *Id.;* S.Rep. No. 93–766 (1974), *reprinted in* 1974 U.S.C.C.A.N. 3946, 3953–58 (detailing Senator Dominick's dissent, including discussion of state laws in Minnesota and Pennsylvania that prohibited strikes and lockouts in the health-care field and comments on the threats from strikes and slowdowns to the "public interest in having access, unimpeded and unhindered, to the best possible health care"). Thus, the defendants cannot rationalize their actions based solely on a general and undefined interest in protecting the health and welfare of the nursing-home patients.

The defendants emphasize, instead, that their actions were taken to effectuate the purposes of the federal Medicaid program. The defendants argue that the Medicaid program evidences Congress's intention not to preempt state action taken to satisfy a state's Medicaid obligations even if that action impacts labor activities. *See N.Y. Tel. Co. v. N.Y. State Dep't of Labor,* 440 U.S. 519, 536, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979) (plurality opinion) ("[T]he federal statute authorizing the subsidy provides additional evidence of Congress' reluctance to limit the States' authority in this area."). The defendants rely heavily on the analogy of this case with *New York Telephone.*

A plurality in *New York Telephone* held that Congress did not intend to preempt state unemployment compensation for striking laborers. *Id.* at 545–46, 99 S.Ct. 1328. The differences in the various opinions in *New York Telephone* focused on the burden in NLRA preemption cases and the appropriate application of various exceptions to *Machinists* preemption. *See id.* at 546, 99 S.Ct. 1328 (Brennan, J., concurring), 549–51 (Blackmun, J., concurring), 557–60 (Powell, J., dissenting). A majority of the justices, however, agreed that the plurality's analysis of Title IX of the Social Security Act, establishing the federal unemployment compensation scheme, and its legislative history demonstrated that Congress did not intend to preempt state unemployment compensation law. *See id.* at 540–46, 99 S.Ct. 1328 (plurality opinion), 547 (Brennan, J., concurring), 547 (Blackmun, J., concurring). Therefore, this court will examine the legislative history of Title XIX.[10]

Congress enacted Title XIX of the Social Security Act in 1965 and established the participatory federal medical assistance scheme, known as Medicaid. Title XIX authorizes the federal government to provide grants to states with programs approved by the Secretary of Health and

---

**10.** The court notes that, in contrast to *New York Telephone,* the relevant legislative history reveals that Congress never considered the circumstances at issue in this case. The plurality in *New York Telephone* commented, however, that "[t]he force of the legislative history ... comes close to removing this case from the pre-emption setting altogether," implicitly recognizing that legislative history rarely provides direct evidence of congressional intent on a preemption issue. *N.Y. Tel.,* 440 U.S. at 540 n. 32, 99 S.Ct. 1328 (plurality opinion). Accordingly, this court still considers the analysis in *New York Telephone* applicable where a defendant raises federal law as a justification for actions that the NLRA would preempt otherwise because the potential conflicts shape the zone of *Machinists* preemption by providing more re-

fined evidence of congressional intent. *See Livadas v. Bradshaw,* 512 U.S. 107, 119, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994) ("If ... the [State's] policy were actually compelled by federal law ..., we could hardly say that it was, simultaneously, pre-empted; at the least, our task would then be one of harmonizing statutory law. But we entertain this and other justifications [for non-preemption] claimed, not because constitutional analysis under the Supremacy Clause is an open-ended balancing act, simply weighing the federal interest against the intensity of the local feeling, but because claims of justification can sometimes help us to discern congressional purpose, the 'ultimate touchstone' of our inquiry." (citation omitted) (citing *N.Y. Tel.,* 440 U.S. at 533, 99 S.Ct. 1328 (plurality opinion))).

Human Services. 42 U.S.C. §§ 1301(a)(6), 1396 *et seq.* Although the Secretary, through HCFA, must approve the State Plans, Congress has granted states wide latitude in structuring state Medicaid programs, especially in the field of rate-setting.[11] Given states' discretion with regard to Medicaid payments, the court concludes that Congress did not intend the NLRA to preempt actions taken pursuant to state Medicaid law, absent explicit prohibition. *See N.Y. Tel.,* 440 U.S. at 544, 99 S.Ct. 1328 (plurality opinion). There is no express prohibition of the defendants' actions in this case. Therefore, the court must determine whether their actions were taken pursuant to either the mandate of Title XIX or the discretion Congress conferred on states to administer Medicaid programs.

District 1199 challenges two categories of the defendants' actions: the defendants' funding of the nursing homes' strike-related expenses and the defendants' services provided through the National Guard and state facilities. The latter category does not implicate any issues regarding Medicaid. Therefore, the court only considers, at this point, defendants' funding of the nursing homes.

The defendants rely on Connecticut General Statutes § 17b–340 to justify payments, beyond the publicly set rates, for extraordinary circumstances.[12] Conn.Gen. Stat. § 17b–340(a) ("The commissioner may, in his discretion, allow the inclusion of extraordinary and unanticipated costs of providing services which were incurred to avoid an immediate negative impact on the health and safety of patients."). The de-

---

**11.** In 1997, Congress modified Title XIX in response to criticisms from states and other organizations that the HCFA excessively micro-managed the state Medicaid programs. Balanced Budget Act of 1997, Pub.L. No. 105–33, § 4711, 111 Stat. 251; H.R.Rep. No. 105–149, at 574–75 (1997) ("Through a network of regional offices, HCFA is supposed to work with State Medicaid departments to ensure appropriate management of Medicaid programs. Many states complain, however, that HCFA's role is less a matter of coordinated cooperation than an example of excess Federal micro-management."); *cf.* H.R.Rep. No. 104–651, at 8, 324–36 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2183, 2189, 2237–49 (proposing more substantial reforms of Medicaid to foster state innovation in handling medical care). As a small step to reform the perceived problems with the Medicaid program, Congress reduced states requirements for rate-setting to some form of state public process, replacing federal substantive and procedural requirements that were "the program's most restrictive barriers to innovation and quality." H.R.Rep. No. 105–149, at 575.

The court presumes that Congress was aware of the body of law developed under NLRA preemption when it enacted Title XIX. *See Cannon v. Univ. of Chicago,* 441 U.S. 677, 696–98, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).

Moreover, Congress presumably knew about the expansion of the NLRA to include health care workers before the 1997 amendments to Title XIX. *See* Balanced Budget Act of 1997, Pub.L. No. 105–33, § 4711, 111 Stat. 251; Act of July 26, 1974, Pub.L. No. 93–360, 88 Stat. 395.

**12.** The court notes that, although District 1199 seeks declaratory judgment that the defendants' interpretation of § 17b–340 constitutes unlawful interference, District 1199 has not challenged that interpretation. In its prior ruling, the court informed District 1199 that if it disputed the defendants' interpretation for purposes of this case, it should move to certify a question to the Connecticut Supreme Court. *New England Health Care, Employees Union, Dist. 1199 v. Rowland,* 170 F.Supp.2d 199, 218 n. 14 (D.Conn.2001). District 1199 did not move to certify. Furthermore, the court notes that preemption analysis does not turn on "Whether the [State's] policy is, as a matter of state law, a proper interpretation of [§ 17b–340] ... rather [it] turns on the actual content of [the] policy and its real effect on federal rights." *Livadas v. Bradshaw,* 512 U.S. 107, 119, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994). Accordingly, the court accepts the defendants 'interpretation of the statute for purposes of this motion.

fendants argue that extraordinary circumstances under § 17b–340(a) would include the strike-related expenses incurred in this case.[13] District 1199 contends that payments for strike-related expenses were not contemplated or authorized by federal Medicaid law.

The defendants need not, however, establish that their actions were authorized specifically by federal Medicaid statutes if the payments fall within the discretion Congress created for states to structure Medicaid programs. *See N.Y. Tel.*, 440 U.S. at 546, 99 S.Ct. 1328 (plurality opinion). As Justice Stevens wrote:

> [A] State's power to fashion its own policy ... is not to be denied on the basis of speculation about the unexpressed intent of Congress.... In an area in which Congress has decided to tolerate a substantial measure of diversity, the fact that the implementation of this general state policy affects the relative strength of the antagonists in a bargaining dispute is not a sufficient reason for concluding that Congress intended to pre-empt that exercise of state power.

*Id.* In this case, the defendants acted pursuant to § 17b–340 in an effort to best effectuate the purpose of the Medicaid program to protect the health and welfare of the nursing-home patients. Accordingly, the court concludes that Congress did not intend to preempt state Medicaid payments for strike-related expenses where

the strike has an immediate negative impact on the health and safety of the patients. Material issues of fact remain, however, as to the whether the strikes in this case created an immediate negative impact that necessitated the defendants' actions.

For example, District 1199 claims that not all the payments made to the nursing homes were necessary for the health and safety of the patients.[14] District 1199 focuses in part on the defendants' reimbursements to nursing homes for replacement workers beyond the period necessary to accommodate the strikes in this case. While the court recognizes that replacement workers may require nursing homes to contract for more than a single day, the nursing homes in this case may have locked out the District 1199 workers for periods longer than the strike and longer than covered by the minimum retainer required for the replacement workers. State subsidies for lockouts, beyond the minimum period required in a reasonable replacement worker contract, would not appear to fall within an exception for Medicaid payments to address an immediate threat to the health and safety of nursing-home patients. The patients suffer no immediate danger where the District 1199 members are willing to return to work, but the nursing homes lock them out in an effort to exert economic pressure. Therefore, the court concludes that the NLRA would preempt state payments, ostensibly

---

**13.** The defendants also focus on a federal regulation regarding Medicare payments to argue that Congress contemplated reimbursement for strike-related expenses as extraordinary circumstances under federal law. *See* 42 C.F.R. § 413.40(g). District 1199's opposition properly distinguishes the cited Medicare regulation, which is part of a different and more complex regulatory scheme, from the Medicaid regulations applicable in this case. *See* Pl.Memo. in Opp. [Dkt. No. 63], at 30–31.

**14.** District 1199 also challenges the defendants' method of paying the nursing homes, specifically the expedited nature of the § 17b–340 payments. The court notes, however, that HCFA has recognized a state's discretion to make advance reimbursements to Medicaid providers before services are rendered. HCFA, Pub. No. 45, State Medicaid Manual § 2490, at 2–101. Accordingly, the defendants' payments are not preempted solely based on the fact that they were paid in advance of the services.

under the Medicaid program, where those payments are not directly authorized by the federal Medicaid scheme or indirectly within the discretion of the State to effectuate the purposes of Medicaid in protecting the health and safety of patients.

At trial, the defendants may raise § 17b–340 as a basis for non-preemption. The court would expect the defendants to introduce evidence that their actions were taken pursuant to that statute. They must show that the strikes created an immediate negative impact on the health and safety of the nursing-home patients. Further, they must establish that the immediate negative impact necessitated the State's Medicaid payments.[15] Absent sufficient evidence that the State's subsidies were made within the discretion afforded to states under the auspices of Medicaid, the NLRA preempts the defendants' actions in this case. Thus, the remaining issues of material fact preclude summary judgment.

### b. Interests Deeply Rooted in Local Feeling

Since the defendants' Medicaid rationale does not justify an inference that Congress intended to allow all state action in this case, the court considers the defendants' alternative argument. The defendants argue that their actions "touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, [the court] could not infer that Congress had deprived the States of the power to act."[16] *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236, 244, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959); *accord Delta Air Lines, Inc. v. Kramarsky*, 650 F.2d 1287, 1299 (2d Cir.1981).

As an initial matter, the court notes that the defendants' alternative position does not present any new arguments regarding the Medicaid payments previously discussed. Therefore, while the local interest argument may provide an alternative basis

---

**15.** In this context, the plaintiff may also be able to challenge whether the payments were reasonably calculated to address the negative impact on patients while respecting District 1199's labor rights. Although the Medicaid scheme may negate the presumption of preemption under *Machinists*, the discretion conferred on states under Medicaid would not support an inference that Congress left the states wholly unfettered by the restraints of the NLRA. Therefore, the court acknowledges that the State may exceed its discretion under Medicaid by making arbitrary payments pursuant to § 17b–340. *See Mass. Nurses Ass'n v. Dukakis*, 726 F.2d 41, 45 (1st Cir.1984) ("We would … add the caveat that any pretextual, arbitrary, or capricious invocation of [a statute] as an excuse … would present quite a different case, subject to different principles."). In so doing, the court intends to "decide if a state rule conflicts with or otherwise 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives' of the federal law," but does not intend to "pass judgment on the reasonableness of state policy." *Livadas v. Bradshaw*, 512 U.S. 107, 120, 114 S.Ct. 2068, 129

L.Ed.2d 93 (1994) (quoting *Brown v. Hotel Employees*, 468 U.S. 491, 501, 104 S.Ct. 3179, 82 L.Ed.2d 373 (1984)).

**16.** "The plaintiff argues that the local interest exception developed under *Garmon* preemption jurisprudence does not apply to cases involving *Machinists* preemption". The court notes that the opinions in *New York Telephone* discussed the local interest exception with little reservation as applied to *Machinists* preemption, showing more concern about proper application of the exception rather than whether it applied. *See N.Y. Tel.*, 440 U.S. at 539–40, 99 S.Ct. 1328 (plurality opinion); 546 note (Brennan, J., concurring); 550–51 (Blackmun, J., concurring); 559–60 (Powell, J., dissenting). Further, in *Metropolitan Life Insurance Co. v. Massachusetts*, 471 U.S. 724, 758, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985), the Court applied a local police power exception to *Machinists* preemption that either mimicked the local interest exception under Garmon or extended that exception to *Machinists* cases. Therefore, the court concludes that a local interest exception must be considered in this case.

for the court's conclusions, it does not present additional grounds to justify any payments by the defendants that were not necessary to protect the immediate health and safety of the nursing-home residents— for example, possibly the subsidies for nursing-home lockouts of District 1199 members. The defendants have no interest, deeply rooted in local feeling and responsibility, to subsidize lockouts when such payments are not necessary to protect the immediate health, welfare, and safety of the nursing-home patients.

Accordingly, the court focuses on the remaining category of conduct challenged by District 1199, the defendants' involvement of the National Guard and use of state facilities. District 1199 seeks an injunction against the defendants for incurring costs to arrange transportation, lodging, and meals for replacement workers and using state vehicles, facilities, property, and National Guard personnel to transport replacement workers. The defendants contend that their actions were taken to protect the health and safety of the nursing-home patients.

The court acknowledges that "[g]iven the vulnerable state of the residents of the nursing homes should there be a cessation of services by those who are charged with their care, ... NLRA supremacy over the economic rights of the unionized employees does not strip the State of its residual powers to protect the lives and health of those residents." *NLRB v. State of N.Y.,* 436 F.Supp. 335, 339 (E.D.N.Y.1977). Thus, "[w]hile the State may not prohibit the employees from going out on strike, ... when it appears that the lives and health of nursing home residents are threatened, the State remains free, in the exercise of its local responsibility, to take whatever reasonable steps are necessary to protect the residents from the effects of strike activity." *Id.* As the Supreme Court noted, despite the strength of the

doctrine of federal preemption in labor law, "nothing [the Supreme Court has] said even remotely affects ... the right or duty of the chief executive or legislature of a State to deal with emergency conditions of public danger, violence, or disaster under appropriate provisions of the State's organic or statutory law." *Div. 1287, Street Employees v. Missouri,* 374 U.S. 74, 83, 83 S.Ct. 1657, 10 L.Ed.2d 763 (1963).

In this case, however, the defendants have not presented any evidence of "public danger, violence, or disaster" that would necessitate the accommodations and conveniences provided by the defendants for the replacement workers. Where the defendants were aware that the nursing homes procured replacement workers to insure the safety of their patients, there is no justification for further exercise of the State's residual police powers absent evidence that District 1199's activities threatened the public peace or safety. As an example, the court perceives an issue of fact with regard to the events that necessitated the State's funding of vans to transport non-striking and replacement workers. Therefore, material issues of fact regarding the danger to public peace and safety, which may have necessitated use of the National Guard and state facilities in this case, preclude summary judgment.

Based on the foregoing analysis, the court denies the defendants' motion for summary judgment on preemption with regard to the defendants' payments for strike-related expenses under Medicaid and the defendants' use of state resources. There are material issues of fact regarding whether the strikes created an immediate negative impact on the health and safety of the nursing-home patients and threatened the public peace and safety and whether the defendants' actions were necessary to protect the patients and the public.

### B. First Amendment Retaliation Claim

█ The defendants also seek summary judgment on the First Amendment retaliation claim against Rowland in his individual and official capacities. District 1199 claims that, by subsidizing and otherwise accommodating nursing homes during the strikes, Rowland retaliated against District 1199 for proper exercise of its First Amendment rights. The defendants argue that District 1199 did not suffer any adverse action, that District 1199 did not suffer any injury, and that Rowland's actions were not motivated by District 1199's exercise of its constitutional rights.

To state a prima facie case for First Amendment retaliation, District 1199 must prove that "(i) [it] has an interest protected by the First Amendment, (ii) the defendants' actions were motivated by or substantially caused by the plaintiff's exercise of that right and (iii) the defendants' actions chilled the exercise of those rights." *Kerman v. City of New York,* 261 F.3d 229, 241–42 (2d Cir.2001). The defendants' arguments regarding adverse action and injury dispute whether District 1199 has established the third element, which requires that District 1199 prove that the defendants' actions, not solely speech, "actually chilled" the plaintiff's speech. *Curley v. Village of Suffern,* 268 F.3d 65, 73 (2d Cir.2001); *see X–Men Sec., Inc. v. Pataki,* 196 F.3d 56, 68–69 (2d Cir.1999). Accordingly, the plaintiff must allege "specific present objective harm or a threat of specific future harm." *Curley,* 268 F.3d at 73 (quoting *Laird v. Tatum,* 408 U.S. 1, 13–14, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972)). If the plaintiff continues to engage in the protected speech that allegedly motivated unconstitutional retaliation, then it failed to establish an actual chilling of its speech. *Id.* (denying claim because plain-

tiff continued to run for mayor every year); *Singer v. Fulton County Sheriff,* 63 F.3d 110, 120 (2d Cir.1995) (continued to print newspaper criticizing village government); *Spear v. Town of W. Hartford,* 954 F.2d 63, 67 (2d Cir.1992) (continued to write critical editorials of town police department).

In this case, District 1199 states that it held a statewide meeting during the May 2001 strikes to discuss in part the defendants' subsidies for nursing homes and their impact on the ongoing strike. The members resolved, with the recommendation of union officers, "to end the strikes and return to work as a group, without contracts" because "their strikes had become futile in the face of the coordinated campaign by the state and employers." Pl.Loc.R. 9(c)(2) Statement [Dkt. No. 64] ¶ 103, at 37. Therefore, the court concludes that there are material issues of disputed fact that preclude summary judgment on the third element of the retaliation claim.[17]

The defendants also argue that District 1199 has no evidence of retaliatory animus on the part of Rowland. The defendants cite cases that protect the First Amendment rights of legislators and other government officials. *See Bond v. Floyd,* 385 U.S. 116, 135–37, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966); *X–Men,* 196 F.3d at 68–69. Those cases, however, are inapposite where the plaintiff alleges *actions* by the defendant, other than the lawful exercise of his First Amendment rights, as the basis for the retaliation claim. *See X–Men,* 196 F.3d at 70–72 ("Cases holding that a decisionmaker may not take action for impermissible reasons do not provide the proper analytical framework for claims against persons who are not decisionmakers but merely advocates."). In this case,

---

17. The court does not limit District 1199 to the allegation cited; rather, it is only provid-

ed as an example of the material disputes in this case.

District 1199 contends that Rowland, himself or through his agents, subsidized and otherwise accommodated the employers during the strikes and lockouts for retaliatory purposes. The plaintiff does not focus on Rowland's comments, which would be protected First Amendment speech, as the basis for the retaliation claim. Rather, District 1199 cites comments and internal memorandum by Rowland and his agents as evidence of his retaliatory intent. Accordingly, there are material issues of disputed fact that preclude summary judgment on the second element. Based on the foregoing analysis, the court denies summary judgment on District 1199's First Amendment retaliation claim.

### C. Qualified Immunity

■ Finally, the defendants argue that Rowland is entitled to qualified immunity for the preemption and First Amendment claims against him in his individual capacity. Qualified immunity applies where "(a) the defendant's actions did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir.1996). Under the first prong, "the defense should be sustained if the court finds that it was not clear at the time of the official acts that the interest asserted by the plaintiff was protected by a federal statute or the Constitution." *Robison v. Via*, 821 F.2d 913, 920 (2d Cir.1987). However, "even if the interest asserted by the plaintiff was clearly of a type generally protected by federal law, the defendant is entitled to immunity as a matter of law if it

was not clear at the time of the acts at issue that an exception did not permit those acts." *Id.* at 921.

The court considers whether Rowland is entitled to qualified immunity for: using the state Medicaid program to subsidize strike-related expenses; employing the National Guard and state resources during the strikes; and retaliating against District 1199 because of its protected speech. In this case, the general contours of NLRA preemption and First Amendment jurisprudence clearly establish that District 1199's activities were protected under federal law.[18]

Under the specific contours of the preemption claim for the defendants' Medicaid payments in this case, however, there is no basis to conclude that "the official's permissible actions were clearly delineated at the time of the acts complained of." *Id.* The defendants raised several exceptions to preemption in its motion for summary judgment. Neither the Supreme Court nor the Second Circuit has clearly defined the scope of those exceptions as applied to strikes of nursing homes, or even as more generally applied to peaceful strikes that pose a risk to third parties. In light of the analysis in *New York Telephone,* and the dicta in *NLRB v. New York* that states must continue to protect the health and safety of nursing-home patients, the court cannot conclude that the defendant violated clearly established law because several exceptions made it unclear whether preemption would extend to Rowland's use of state Medicaid funds. *See N.Y. Tel. Co. v. N.Y. State Dep't of Labor,* 440 U.S. 519, 99

---

**18.** District 1199 may have conceded that it does not seek damages against Rowland for the preemption claim because its qualified immunity analysis fails to address that claim. Pl.Memo. in Opp. [Dkt. No. 63], at 38–40. However, the Second Amended Complaint names Rowland individually for the First and Second Counts and recites a general request

for relief that includes damages. The complaint does not differentiate particular counts as the basis for the award of damages. The court reads the Second Amended Complaint as alleging a preemption claim against Rowland individually for damages and, therefore, addresses the defendants' qualified immunity analysis on all claims.

S.Ct. 1328, 59 L.Ed.2d 553 (1979) (plurality opinion); *NLRB v. N.Y.*, 436 F.Supp. 335 (E.D.N.Y.1977). Moreover, given the potential injury to nursing-home patients on a statewide level, the court would further conclude that it was objectively reasonable for Rowland to believe that his actions did not violate the law under NLRA preemption. Therefore, the court concludes that Rowland is entitled to qualified immunity in his individual capacity as to any damages arising out of District 1199's preemption claim based on the use of Medicaid funds.

▇ In the context of the Rowland's use of state resources, such as the services of the National Guard, parking facilities, and transportation, the local interest exception to preemption is clearly established and provides a standard for Rowland's conduct in this case. There are material issues of fact, however, with regard to whether Rowland responded to a danger to public safety or immediate threat to the health and safety of nursing-home patients and, therefore, justified employing state resources under the local interest exception. Further, taking the facts most favorable to the plaintiff, the court concludes that it would not be objectively reasonable for Rowland to believe that his use of state resources, in the absence of public danger, violence, or disaster, was lawful and did not violate NLRA preemption. Therefore, there are material issues of fact that preclude the court from finding as a matter of law that Rowland is entitled to qualified immunity on the preemption claim with regard to his use of state resources.

In the First Amendment context, the defendants have not raised any exceptions or other principles that draw into question the specific contours of District 1199's First Amendment rights in this case. It is clearly established that a decisionmaker violates a plaintiff's First Amendment rights when he takes action against the plaintiff in retaliation for the plaintiff's protected speech. The defendants contend, however, that it was objectively reasonable for Rowland to believe his actions were lawful based on the circumstances of the strikes. The defendants' argument in essence claims that, even if District 1199's protected speech motivated or substantially caused Rowland's actions, Rowland would have taken the same steps in the absence of that impermissible motivation because he was concerned about the health and safety of the nursing-home patients.

The court concluded in the previous section that material issues of fact regarding Rowland's motivation preclude summary judgment on District 1199's First Amendment claim. These factual disputes also raise questions regarding whether Rowland would have acted similarly absent motivation to retaliate for District 1199's protected speech. If Rowland took any measures that he would not have taken otherwise, he violated District 1199's First Amendment rights. It is not objectively reasonable for a state official to believe that, so long as he retaliates using methods supported by lawful authority, retaliation for protected speech does not violate a plaintiff's rights. The fact finder must consider the official's intent and determine whether he would have taken the same actions regardless of his motivation to retaliate. *See Vega v. Miller*, 273 F.3d 460, 469 (2d Cir.2001); *Kerman v. City of New York*, 261 F.3d 229, 242 (2d Cir.2001).

Further, the court concluded that there are material issues of fact as to whether an immediate threat to the nursing-home patients' health and safety existed. These factual disputes raise additional questions about Rowland's alleged permissible motivation for his actions. Accordingly, the court finds that material issues of fact preclude finding that Rowland is entitled

to qualified immunity as a matter of law on the First Amendment claim.

## III. CONCLUSION

For the foregoing reasons, the defendants' Motion for Summary Judgment [Dkt. No. 57] is GRANTED IN PART and DENIED IN PART. The court finds that defendant Rowland is entitled to qualified immunity on the preemption claim with regard to his use of Medicaid funds. In all other respects, the motion is denied.

**SO ORDERED.**